In re **PAJARO DUNES RENTAL AGENCY, INC., a California Corp., dba Monterey Bay Caterers, Debtor.**

**PAJARO DUNES RENTAL AGENCY, INC., a California Corp., dba Monterey Bay Caterers, Plaintiff,**

v.

**Laurence L. SPITTERS, Trustee for Eight Irrevocable Trusts of Children of Laurence L. Spitters; Laurence L. Spitters, an Individual, Defendants.**

**Bankruptcy No. 91–53976–ASWCZ.**
**Adv. No. 92–5006.**

United States Bankruptcy Court,
N.D. California.

Oct. 19, 1994.

Craig K. Welch (argued), of Welch, Olrich & Mori, San Francisco, CA, for Pajaro Dunes Rental Agency, Inc.

James R. Stillman and Louis J. Grimmelbein, IV (argued), of Murphy, Weir & Butler, San Francisco, CA, for Laurence L. Spitters.

## DECISION

ARTHUR S. WEISSBRODT, Bankruptcy Judge.

This action involves a complaint to avoid allegedly fraudulent and preferential transfers, under 11 U.S.C. §§ 544(b), 547 and 548. Plaintiff/Debtor, Pajaro Dunes Rental Agency, Inc. ("PDRA"), claims that a $1 million note against it in favor of Defendants, Laurence Spitters, et al. ("Spitters"), supposedly used to finance construction of a new office building and conference center, is void as a fraudulent transfer. PDRA also claims that the interest payments made on this note within one year of its bankruptcy petition are avoidable both as fraudulent and preferential transfers. PDRA was represented by Craig Welch, Esq. of the firm of Welch, Olrich & Mori.[1] Spitters is represented by James Stillman, Esq. and Louis Grimmelbein, Esq. of Murphy, Weir & Butler.

Trial witnesses included William Cox, James Maggio, Ryland Kelley, Randall Sugarman, Hurle Fugitt, Jun Delacruz, Anita Sandee, Deborah Hagerman, Lawrence Spitters and Dr. Bruce Ricks. Briefing and oral arguments followed the trial.

This case has had a long and complex history. The factual background to follow covers the nearly thirty years of development at Pajaro Dunes, an exclusive beachfront development on Monterey Bay. PDRA's bankruptcy petition was filed over three years ago, and since then it has undergone a change of ownership and two changes in management.[2] Recently, on September 22,

---

**1.** Welch's motion to withdraw as counsel for PDRA in both this adversary and the main bankruptcy case was granted on September 18, 1994.

**2.** These changes are largely responsible for sparking the four other adversary actions brought as a part of PDRA's bankruptcy case:

*Pacific Western Bank v. Pelican Point et al.*, Adversary No. 91–5271 (case closed 11/19/92); *PDRA v. HBK California Mortgage Fund*, Adversary No. 93–5261; *PDRA v. Pajaro Dunes Association ("PDA")*, Adversary No. 93–5321; *PDRA v. Riesenhuber*, Adversary No. 93–5638.

1994, David Bradlow was appointed Chapter 11 trustee for the estate.[3] The seven-day trial featured sophisticated expert witnesses who were knowledgeable about litigation as well as accounting and valuing businesses and/or real property. However, the parties, while elaborately outlining their legal arguments, occasionally failed to present sufficient evidence to answer questions raised by the Court. Examples of this absence will be evident at several locations within this Decision.

The following represents the Court's findings of fact and conclusions of law, issued pursuant to Fed.R.Bankr.P. 7052.

## I. FINDINGS OF FACT

### A. THE EARLY YEARS

Hare, Brewer and Kelley ("HBK") is a California corporation, founded in 1925. The sole current shareholders are brothers, William and Ryland Kelley. Ryland Kelley ("Kelley") joined HBK in 1948, and has served as its president for over 25 years. HBK was primarily involved in developing residential real estate until the 1960's, when it began to involve itself in commercial properties. Much of modern downtown Palo Alto, California is the product of HBK projects.

During the 1960's, HBK developed a planned community, called "Pajaro Dunes," on the Pacific coast of California west of Watsonville. The property was originally acquired by the Kelleys in 1963. They transferred it to Triad, a limited partnership in which HBK was a general partner.[4] After receiving the appropriate permits from the County of Santa Cruz, Triad began construction in 1965.

Pajaro Dunes is a very affluent community, populated by many business executives working in the nearby Santa Clara valley, otherwise known as "Silicon Valley." It features beachfront property and exposure to considerable amounts of wildlife, as well as man-made attractions such as golf and tennis.

Pajaro Dunes is organized into several separate homeowners' associations, including but not limited to Pajaro Dunes Homeowners' Association ("PDA") and Pelican Point Homeowners' Association ("Pelican"). Many homeowners in Pajaro Dunes do not live there year-round. Instead, they rent out the dwellings, often using the rental payments to service the indebtedness of their houses. To facilitate this practice, in 1969 HBK created a rental business to find short-term tenants for the homeowners. This business was entitled PDRA, but was still often referred to as HBK.

The 1965 county permit for Pajaro Dunes was succeeded by another issued in 1974, which was amended in 1976. According to this 1976 permit, Triad was authorized to conduct meetings, seminars and similar activities in various common and private facilities. The common facilities, such as the recreation hall, were owned by PDA, and HBK, as Triad's agent, arranged such seminars and meetings in conjunction with the above-mentioned rental business.

However, in 1979, the County of Santa Cruz began to question whether holding such meetings at the PDA-owned recreation hall violated the County's fire and safety ordinances. After extensive negotiations, PDA obtained a new permit (in December 1981) entitling it (or its assignee) to maintain offices and facilities at Pajaro Dunes for the purposes of selling and renting property, providing food service and arranging seminars, including in the recreation hall.

On April 26, 1982, HBK negotiated a license from PDA assigning it PDA's rights under the 1981 permit. This agreement enabled PDRA to remain in business (catering and renting residential and meeting premises). In return, HBK began paying a monthly licensing fee to PDA, and promised to

---

3. The Trustee has not participated in this adversary proceeding, but is aware of it.

4. Kelley testified at trial that many other limited partnerships were involved in financing different elements of the Pajaro Dunes project over the

years, but he did not specify what they were. The Court is aware of the role of HBK–California Mortgage Fund, the defendant in another fraudulent transfer adversary action filed by PDRA. See n. 2, supra.

expand and upgrade PDRA's offices. At the time, PDRA was operating out of a building known as the "Cottage house," and many of the homeowners were concerned about its unsightly appearance.

## B. PDRA AND ITS CORPORATE STRUCTURE

PDRA was incorporated on January 1, 1983. The primary purpose of this change was so that PDRA could obtain financing based on its own credit, separate from that of HBK. HBK held 87.5% of PDRA's stock. The remaining 12.5% was held by Porter Drive Properties, a limited partnership, of which William and Ryland Kelley were general partners. Following incorporation, Kelley was the sole member of the board of directors of PDRA.[5] No significant changes occurred in its day-to-day operations.[6] Despite its newly-independent status, PDRA continued to operate as a division of HBK with regard to the licensing agreement with PDA. PDA did not complain about this new arrangement.

During the intervening years between PDRA's incorporation and the transfer at issue in this case, Triad divested itself of many of its holdings at Pajaro Dunes. The house at 143 Puffin Lane ("House 143") was deeded to the Kelley brothers in 1972, and in 1975 a site upon which would eventually be built the "office building," to be discussed *infra*, was similarly transferred.[7]

Authority at PDRA was split during the 1980's. Kelley made all of the important decisions, such as acquiring property and the like. Day-to-day operations were controlled by James Maggio ("Maggio"), PDRA's general manager. Maggio was experienced in the hotel and entertainment industry, and ran PDRA, with its residential, meeting and catering services, much like a large hotel. Maggio was the highest-ranked employee who routinely worked at PDRA's offices in Pajaro Dunes.

A practice developed during the 1980's of "upstreaming" cash from PDRA to HBK.[8] PDRA is a seasonal business, with most annual income accruing during the months from April through September, and operating losses being incurred throughout the winter. Several times annually, when PDRA had cash surpluses, Kelley would order Maggio to send the surplus to HBK's accounting department. These requests occurred when HBK was short of cash on its own, usually several times each year. Maggio testified that these transfers often left PDRA very short of cash, as HBK did not allow PDRA to retain minimum levels of cash reserves immune to upstreaming.

The upstreamed cash was recorded as an obligation of HBK to PDRA in the accounting records of both corporations. At one point during early 1986, these obligations (accumulated since the late 1960's) were written off. William Cox, HBK's Chief Financial Officer, testified at trial that as no audit was performed prior to that point, it was (and is) impossible to ascertain the net value of those deleted transfers.

A new agreement was reached between PDA and HBK in 1986.[9] PDRA officials (not Maggio) were involved in the negotiations, but PDRA was not a party to the contract. By this time, PDRA had left the Cottage House (which was then demolished) and was operating from several portable trailers. Despite landscaping work and other attempts to disguise these structures, homeowners at Pajaro Dunes were still complaining about the appearance of the PDRA premises.[10] HBK and PDA therefore agreed to construct

---

5. Kelley continued to earn a salary from HBK all through the 1980's, and maintained his personal offices at HBK's offices in Palo Alto. No evidence was presented that Kelley earned a salary from PDRA.

6. James Maggio, PDRA's general manager, testified at trial that Kelley, even after the incorporation, often referred to PDRA as a "department" of HBK.

7. It is not clear whether the initial transfer from Triad was to HBK or to the Kelleys personally.

8. Funds transferred from HBK to PDRA were "downstreamed."

9. This agreement was amended and updated in 1988.

10. By this time (1988), homes at Pajaro Dunes were renting for up to about $500/night.

a new office building on land owned by the Kelleys ("the Office Building") to house the rental business.[11]

An additional element of the 1986–1988 agreement between PDA and HBK called for the construction of a new conference center to host seminars and meetings at Pajaro Dunes. This building would become known as the Sandpiper Conference Center ("Conference Center"). Kelley testified at trial that at this time PDRA often had to turn away conference business due to lack of available facilities.

The terms of the agreement included an extension of HBK's license from PDA to operate its rental/meeting/catering business (PDRA) at Pajaro Dunes through 2008. HBK would maintain ownership of the Office Building through that time, but the property would then be deeded to PDA. The Conference Center would be immediately transferred to PDA upon completion, but HBK would enjoy the use of the building for 100 days per year rent-free through 2008. HBK was forbidden from transferring/assigning any of its rights and privileges under this agreement without PDA's prior written approval, but PDA promised not to withhold such approval unreasonably.

An architectural firm, Moyer & Associates, spent considerable time with both Kelley and Maggio designing the two buildings to fit both the aesthetic and business needs of the Pajaro Dunes community. The Office Building was to be located in a floodplain, and new FEMA (Federal Emergency Management Agency) mandates for floodplain construction required expensive "anchoring" of the foundation to deep bedrock.

During 1988, HBK began to face increasing financial difficulties. Many of its real property holdings began to suffer from the market-wide downturn in land prices, resulting in less rental income for the developer/owner. The cash shortages which led to upstreaming from PDRA became more common, as HBK was unable to obtain sufficient new financing for both its short-term and long-term needs.

PDRA was also suffering from financing problems, specifically with regard to the new Office Building and Conference Center. Late in 1988, Pacific Western Bank ("PWB") extended a line-of-credit to PDRA, which helped to tide it over the cash-poor winter months. However, neither PWB nor Wells Fargo Bank were willing to loan money, to HBK, PDRA or any combination of the two, to construct an office building which was limited in its use to housing a rental business at Pajaro Dunes. Because of these refusals to provide financing, PDA began to fear that the office building, promised in some form since 1982, would never be constructed. To assuage the homeowners' fears, and thereby maintain the business license, Kelley began to search for alternate forms of financing.

## C. *THE WHITE KNIGHT*

Laurence Spitters is a significant figure within the Silicon Valley business community. A graduate of the University of Michigan School of Law and the Harvard School of Business, Spitters is a founder and former chief executive officer of Memorex Corporation. He also is a long-time homeowner at Pajaro Dunes and a member of PDA.

Spitters first learned about the proposed construction of the Office Building and Conference Center in 1986, by reviewing the minutes of PDA board meetings discussing the association's relationship with HBK and PDRA. Spitters agreed that a new office building was needed, due to the shabby appearance of the prefabricated trailers, but opposed the construction of the Conference Center due to his belief that PDA would have to pay for it. He met with Kelley, who explained that HBK would build the Sandpiper Conference Center as part of the 1986 license-extension agreement. Spitters then withdrew his opposition.

Shortly before the end of 1988, Kelley approached Spitters (in the Pajaro Dunes parking lot) with a proposal that Spitters make a loan to finance the construction of the Office Building and Conference Center. Spitters was not interested in making such a

---

11. The building permit for the Office Building specified that the building was to house a business involved in renting residential and meeting spaces at Pajaro Dunes.

loan at that time, and demurred to discuss the issue in depth.

Kelley brought up the matter with Spitters in a more formal fashion on February 28, 1989, writing a letter (on HBK letterhead) to Spitters at his Palo Alto offices, proposing a $1 million loan with specified terms and security. This loan proposal led to a meeting between Spitters and Kelley on April 12. At the meeting, Kelley told Spitters about his failures to obtain bank financing for the construction, and expressed his fear that continued delays in beginning work on the two buildings would lead to the loss of the license from PDA to operate PDRA at Pajaro Dunes.

Spitters was now much more willing to consider Kelley's proposal then he had been in December. Spitters considered it important to keep the operating license in HBK's hands, as he felt that a stable relationship between HBK and PDA was profitable for all concerned. He also felt that HBK was creditworthy, and that the PDRA operations at Pajaro Dunes would also make this type of loan secure.

Another change from December involved Spitters' cash liquidity. Over the past twenty years, Spitters had established trusts for each of his eight children. Spitters was the trustee for each of these, and invested the entrusted funds for their benefit. Shortly before the April meeting between Spitters and Kelley, Spitters had sold some Hawaiian property and was looking for a new source of income for the trusts. The HBK loan appeared to be a prudent investment.

This was not the first financial dealing between Spitters and Kelley. Both members of the Palo Alto business elite, the two had been friends and business associates for over fifteen years.[12] Both Kelley and Spitters owned homes at Pajaro Dunes. At the time, Spitters had the highest regard for Kelley.

On May 1, 1989, the deal was signed. In return for the money, Spitters received a note executed by *both* HBK and PDRA for $1 million. Spitters was not interested in a long-term investment in PDRA, so the term of the loan was only eight months. Kelley's plan was either to refinance the Office Building after it had been completed, in the belief that banks would be more willing to loan money secured by a completed structure, or to sell several lots at Pajaro Dunes to raise the funds to repay Spitters. No refinancing arrangements were confirmed with any bank or other source at this time. HBK brokered the loan, and took a $10,000 fee (which was paid from the loan proceeds, and did not reduce the obligation to repay Spitters).

The note was secured by a Deed of Trust and assignment of rents to Spitters for the Office Building, as well as by assignment of HBK's rights in the Conference Center.[13] Spitters believed that by having the security interest in (and therefore the right to nonjudicially foreclose on) PDRA's new headquarters, in the event of default he would have the ability to control PDRA and force it to use its available cash flow to repay him. As of the date Spitters entered into the loan agreement with HBK and PDRA, he was not aware of the upstreaming of cash from PDRA to HBK.

Spitters made the following payments to HBK, in accord with the loan terms; $250,000 on May 1, 1989 (when the loan was signed), $150,000 on June 15, $150,000 on July 30, $150,000 on September 13, $150,000 on October 28, and $150,000 on December 12, totalling $1 million. All of these checks were

---

12. Most recently, Spitters and Kelley had been co-investors in a small deli market (Food, Food, Food Inc.), which was a failure, and Norm's Starlight Supermarket (the only market in downtown Palo Alto), which was fairly successful. Both men were board members of Embarcadero Publishing (the owner of the Palo Alto Weekly, a local newspaper) and were also members of the Palo Alto Club, a dining and social organization.

13. The Conference Center agreement had been completed with PDA on December 18, 1988. As related *supra*, the agreement provided that HBK would transfer the Conference Center to PDA upon completion, in return for rent-free use of the building for 100 days/year until 2008. This agreement was an integral part of the overall relationship between HBK and PDA, including the new Office Building and the extension of the operating license.

HBK was not permitted to assign or encumber its rights under the agreement without PDA's prior written approval, but PDA was not to withhold such approval unreasonably.

made payable and delivered to HBK. Kelley had instructed Spitters to make and deliver the checks in this fashion. All these funds were co-mingled with HBK's funds.

Despite the fact that both HBK and PDRA were co-makers of the loan, the Spitters loan was recorded on HBK's accounting books, but not on PDRA's accounting books.[14] The deed of trust was recorded on the chain of title of the Office Building and its site, but this property was owned by HBK.

On May 5, 1989, Spitters filed a UCC–1 financing statement on the assignment to him (as security for the note) of HBK's rights to use the Conference Center, and PDRA was listed as an additional debtor on this document. This statement did not list the $1 million amount of the loan, nor its term of eight months. In addition, the Office Building was not mentioned, and the stated collateral, the Conference Center rights, were only listed as belong to HBK.

Construction of the Office Building took from March 1989 to March 1990. The Conference Center was completed during approximately this same time period. HBK (not PDRA) had contracted with architectural (Moyer & Associates) and construction (H.E. Fugitt Construction) firms to design and build the Office Building and Conference Center.[15] Fugitt would submit invoices to Maggio, who sent them to Moyer & Associates for approval. After approval, Maggio paid the invoices.[16]

### D. *IMPENDING DISASTER*

During the construction period (March 1989 to March 1990), the financial status of both HBK and PDRA continued to deteriorate. On at least one occasion, HBK had to lay off personnel when it could not meet its regular payroll. Kelley's demands for up-streamed funds from PDRA compelled Maggio to use the PWB line-of-credit for this purpose when PDRA did not have sufficient surpluses from its operating budget. This use, or in fact any transfer of funds to HBK, was in apparent violation of the line-of-credit agreement with PWB.

In July 1989, HBK defaulted on its interest payments to a loan fund partnership, "Prime–Plus," that it operated and used as a source of investment capital. Altering his plans to develop several other hotel properties and use PDRA to manage them, Kelley now began to attempt to market PDRA *in toto* to various private investors, without success.[17]

Conflicting evidence was presented at trial regarding the fate of the $1 million from Spitters delivered to HBK. It is clear that as each check was delivered from Spitters, the funds (either $250,000 or $150,000 at a time) were deposited into HBK's general operating account. Within several days after each delivery of a $150,000 installment, a check for $150,000 was delivered from HBK to PDRA. There is no evidence of a similar transfer shortly after the $250,000 disbursement from Spitters to HBK on May 1, 1989. Therefore, at least $250,000 of Spitters' loan funds did not reach PDRA. However, during the entire period Spitters was delivering the note payments to HBK, PDRA was up-streaming funds to HBK in large quantities. For example, Plaintiff's Exhibit 28 indicates that checks for $175,000 each were issued by PDRA in favor of HBK on June 5, 1989 and July 31, 1989. PDRA specifically alleges that any and all funds possibly remitted to PDRA by HBK from the Spitters loan proceeds were almost immediately returned to

---

**14.** Kelley instructed Maggio that the loan would be recorded in the records of HBK.

**15.** H.E. Fugitt Construction is owned by Hurle Fugitt ("Fugitt"). Fugitt testified at trial that his firm had done much of the routine construction and maintenance activity at Pajaro Dunes for many years.

**16.** Fugitt was not paid for his last $17,000 of work on the Office Building, nor for $27,000 on

the Conference Center. Fugitt has filed mechanics' liens against the buildings.

**17.** The name of Walter Eissman was mentioned at trial in connection with these attempts to sell PDRA. The record is not clear whether or not such an offer was made to Spitters during *1989, see infra,* although clearly Spitters discussed the matter with both Kelley and Maggio several times during 1990.

HBK through the upstreaming process.[18] Spitters responds to this argument through the testimony of Kelley and Jun Delacruz,[19] who represented that PDRA could not have paid for the construction of the Office Building and the Conference Center without the Spitters funds.[20] No argument was specifically made to the Court that the rate of upstreaming was directly affected by the transfer of the Spitters loan funds, i.e., that an additional $750,000 was upstreamed to HBK over what would have been transferred had the Spitters loan not been made. PDRA did argue that the loan funds themselves had been upstreamed back to HBK, but no evidence was presented concerning the *rate* of upstreaming before the Spitters loan.

As each of the five $150,000 transfers was made from HBK to PDRA, a similar amount was deducted from the accounting record of how much cash HBK owed PDRA as a result of upstreaming.[21] It was not discussed at trial whether Kelley or anyone else at HBK directed that the transfer of the Spitters funds be recorded in this fashion, but Bill Cox, HBK's Chief Financial Officer, testified that the Spitters note was considered a debt of HBK, not PDRA, despite PDRA being a co-maker of the loan.[22]

Cox also testified that PDRA did not credit as an asset funds spent on construction of the Office Building (at least until June 1990). PDRA also did not record any value from depreciation of the Office Building during this time period.

Financial conditions at HBK and PDRA reached a crisis in January 1990. In November 1989, Maggio had sent a letter to Kelley, warning that PDRA was out of cash, that PDRA's line-of-credit from PWB was exhausted, and that a "panic" could arise among PDRA's employees if they learned about the dire nature of the situation. HBK, however, was in no position to assist its subsidiary.

The Spitters note came due on January 1, but neither HBK nor PDRA had the cash to repay it on time. On December 15, 1989, Kelley had sent Spitters a letter, admitting that HBK could not repay the loan on time and asking to negotiate a new repayment schedule. Spitters testified at trial that he was disappointed about this default, but that he also believed that Kelley was honest and forthright. Spitters agreed to cooperate with HBK, and on January 29, 1990, the Kelleys signed personal guarantees of the Spitters loan. In return, Spitters extended the due date on the note to April 1, 1990.

On January 22, 1990, HBK and the Kelleys transferred House 143 to PDRA. House 143 had been previously used by PDRA as one of its smaller conference sites.

April 1 arrived, but as on January 1, 1990, neither HBK, PDRA nor the Kelleys were able to repay the loan. However, Spitters continued to cooperate with Kelley, hoping that Kelley could sell PDRA and thereby repay the $1 million note. Kelley offered to sell the business to Spitters himself, but Spitters was not interested at that time.

18. The following sequence is illustrative: 1) On July 30, 1989, Spitters issued a $150,000 check to HBK. 2) On July 31, PDRA issued a $175,000 check to HBK. 3) On August 3, 1989, HBK issued a $150,000 check to PDRA.

19. Delacruz was PDRA's comptroller/accountant. He was hired in November 1980, and fired by PDRA's post-petition management in December 1991. Delacruz is not licensed as a CPA in California.

20. Anita Sandee, HBK's cash manager (in charge of HBK's weekly cash intake and disbursements) and Deborah Hagerman, PDRA's accounting supervisor, both testified that the five $150,000 transfers from Spitters to HBK, and the five $150,000 transfers from HBK to PDRA, were commonly referred to as "Spitters money," and that the clear purpose of the transfers was to finance the two new buildings. In contrast to Kelley and Delacruz, Sandee and Hagerman did not testify as to PDRA's ability to build the Office Building and the Conference Center without Spitters' funds.

21. This deduction occurred in the books of both HBK and PDRA.

22. Cox also testified that PDRA's accounting department was supposed to conform their procedures to those of HBK, and that he sometimes altered PDRA-supplied information when he integrated it into HBK's own balance sheets and statements. Delacruz also testified that HBK employees had occasionally instructed him to alter his accounting procedures.

From the beginning of the loan term (May 1989), Spitters had monthly invoiced both HBK and PDRA for the contract interest owed him. Early on, HBK had made the payments, but at some point PDRA took over this duty. Even after the loan went into default on April 1, 1990, Kelley instructed Maggio to continue to make the interest payments to Spitters on a timely basis. From July through November, 1990, PDRA made four interest payments to Spitters for a total of $43,095.89.[23]

On May 9, 1990, HBK and the Kelleys transferred, through grant deed and assignment, several assets located at Pajaro Dunes to PDRA. These included three condominiums known as "Cypress 8–9–10," the Office Building and HBK's rights to the Conference Center.[24] The grant deed for the Office Building stated that the net taxable value of the property, after deducting liens, was "0." [25]

News stories on HBK's financial instability began to appear during the fall of 1990. These stories also ran in the Palo Alto Weekly, a newspaper of which both Kelley and Spitters were board members of the controlling company.[26] Spitters began to press Maggio for information about PDRA's finances, including the amount of cash which had been upstreamed to HBK. Maggio was initially reluctant to discuss such matters with Spitters, but Kelley instructed him to give Spitters any information that he requested. In November 1990, PWB set off some of the debt that it was owed on PDRA's line-of-credit against PDRA's deposits with the bank.

The last interest payment actually made on the Spitters loan was mailed on October 31 (and deposited on November 5), 1990. On November 2, 1990, Spitters filed suit [27] against HBK, PDRA and the Kelleys in Santa Cruz County Superior Court for; 1) breach of promissory note, 2) foreclosure of security interest, 3) breach of written guaranty, 4) judicial foreclosure of deed of trust, 5) money lent, and 6) appointment of receiver and injunctive relief. This suit asked for a money judgment of $1 million plus interest, foreclosure of the deed of trust and security interest covering the Office Building and HBK/PDRA's rights to the Conference Center, and the appointment of a receiver to control those assets pledged as security for the loan.[28]

On July 1, 1991, PDRA filed a petition under Chapter 11 of the Bankruptcy Code,[29] staying the state court proceedings against it. *See* 11 U.S.C. § 362.

### E. *PELICAN FLIES IN*

During 1986, storm action damaged the sea wall protecting the 84 condominiums of the Pelican Point Homeowners' Association ("Pelican") at Pajaro Dunes. Pelican incurred some $900,000 in expenses repairing the wall. Pelican then filed suit against HBK to recover these costs, basing its case on HBK's responsibility as the developer of Pelican. Pelican recovered a large judgment in Santa Cruz County Superior Court.

Based on its judgment, Pelican obtained a turnover order from the superior court, and seized HBK's 87.5% interest in PDRA. This occurred on July 1, 1991,[30] the same day that

---

**23.** These were the only payments made by PDRA to Spitters within one year of PDRA's bankruptcy petition.

**24.** The transfer of the Conference Center rights was made without the approval of PDA. The Court makes no finding whether or not this transfer was properly accomplished.

**25.** Maggio testified that the Kelleys set the value of non-cash transactions between HBK and PDRA, without input from PDRA employees.
 The grant deed also made PDRA the new guarantor of the Spitters note and successor in interest to the Kelleys. *See* 156 B.R. 263, 265 (N.D.Cal.1993) (Vukasin, J.)

**26.** *See* n. 12, *supra.*

**27.** Case No. 115893

**28.** Spitters testified that the timing of this suit was not affected by the receipt (or non-receipt) of the interest payment mailed October 31, 1990.

**29.** The Bankruptcy Code is 11 U.S.C. §§ 101 *et seq.* Chapter 11 begins at 11 U.S.C. § 1101.

**30.** Because HBK did not comply with the initial turnover order, the Superior Court issued an order substituting actual ownership of the stock of PDRA in favor of Pelican on July 11, 1991.

PDRA filed for Chapter 11 bankruptcy.[31]

Pelican, represented by two of its officers, Ms. Kathleen Martin ("Martin") and Mr. Delvin Riesenhuber, voted to remove Kelley from PDRA's Board of Directors. Pelican took over the Board, and Martin became PDRA's Chief Operating Officer. Martin ordered a full review of PDRA's records, assets and liabilities by an outside accountant, Randall Sugarman, of Sugarman & Co. As a result of this review, Martin confirmed for Pelican the existence of PDRA's $1 million liability to Spitters.[32]

## F. *INTO FEDERAL COURT*

Though he was precluded from proceeding against PDRA by the automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362, Spitters pressed his collection action against HBK and the Kelleys. On October 7, 1991, Spitters accepted a stipulated judgment against HBK and the Kelleys for $1 million in principal plus accumulated interest and attorney's fees, for a total of $1,111,178.18. This represented the total obligation owed by HBK, PDRA and the Kelleys on the original note. However, it proved to be uncollectible. HBK virtually ceased operations during the second half of 1992, and filed a petition under Chapter 7 of the Bankruptcy Code [33] on December 12, 1992.[34] Jerome Robertson was appointed as HBK's trustee, and throughout 1993, HBK's assets were either abandoned as overencumbered or lost as secured creditors gained relief from the automatic stay. *See* 11 U.S.C. § 362(d).

Since the filing of the present action, the Kelleys have also filed personal petitions in bankruptcy in the San Francisco Division of the Northern District of California. Counsel have indicated that it is unlikely that any significant recovery will be available for either PDRA or Spitters from the estates of HBK and the Kelleys.

Many of PDRA's employees were replaced during late-1991. In December 1991, Delacruz was fired and Maggio left the company.[35] Hagerman had already left on maternity leave in November 1991, and she formally resigned in February 1992.

On December 31, 1991, PDRA filed this adversary action in federal bankruptcy court, alleging that the $1 million note was a constructively fraudulent conveyance under 11 U.S.C. § 544(b), and that interest paid on it within one year of the bankruptcy petition was also fraudulent and preferential under 11 U.S.C. §§ 547 and 548. PDRA also sued for declaratory relief, to quiet title and for a determination of the validity of Spitters' lien against the Office Building and Conference Center rights. PDRA did not claim that the Spitters note was actually fraudulent, and no evidence was presented that PDRA has any present creditors whose claims arose before May 1, 1989, *i.e.*, the date of the Spitters loan.

Spitters countered with a motion to dismiss one of the counts of the adversary proceeding based on PDRA's complaint, which asked for a determination of the validity of liens and to quiet title. PDRA made a counter-motion for summary judgment on this same count. On June 24, 1992, the Court issued its decision on these motions, holding that because he had accepted a monetary judgment against the co-debtor (HBK) and guarantor (the Kelleys), Spitters was barred by California Code of Civil Procedure § 726, the codification of the so-called "one-action rule," from enforcing his Deed of Trust and effecting a non-judicial foreclosure. 142 B.R. 383, 385–89. By taking cash, Spitters had waived his lien. Summary judgment was entered in favor of PDRA. The district court affirmed the decision. *See* 156 B.R.

---

31. The bankruptcy petition was filed by PDRA when it was still being managed by Kelley, before the enforcement of the turnover order. No evidence was presented at trial that the filing was or was not directly linked to the turnover order.

32. The Court does not find that Martin and/or Pelican were unaware of the Spitters note before this time.

33. 11 U.S.C. §§ 701 *et seq.*

34. Case No. 92–58959JRG

35. No evidence was presented at trial as to whether Maggio resigned or was fired.

263 (N.D.Cal.1993) (Vukasin, J.).[36] The case then proceeded to trial on the remaining counts of fraudulent transfers and preferential payments.

## II. *STATEMENT OF THE CASE*

The primary issue before the Court is whether the Spitters note was a constructively fraudulent transfer in violation of the California Fraudulent Transfer Act, specifically Cal.Civ.Code § 3439.04(b). This Decision will first review the history and structure of fraudulent conveyance law and the California statute. Next, the Court will determine whether PDRA has standing to raise the current action in light of certain decisions of the United States Court of Appeals for the Ninth Circuit. Evidence will be reviewed to determine whether the elements of the statute have been met, *i.e.*, what value was delivered by Spitters to PDRA and whether that value was reasonably equivalent to PDRA's obligation on the note. Finally, a remedy will be constructed within the precepts of fraudulent transfer and bankruptcy law and the facts of this individual case.

## III. *CONCLUSIONS OF LAW*

### A. *JURISDICTION AND VENUE*

The Court has jurisdiction over the case pursuant to 28 U.S.C. §§ 157, 1334. This matter is core. 28 U.S.C. §§ 157(b)(2)(F), 157(b)(2)(H). Venue is proper according to 28 U.S.C. § 1408.

### B. *HISTORY, THE LAW, AND THE CODE*

■ All common-law fraudulent conveyance actions have their basis in the Statute of 13 Eliz., ch. 5. (1571), especially as elaborated in *Twyne's Case*, 3 Coke 80b, 76 Eng.Rep. 809 (K.B. 1601) (Star Chamber). The purpose is to prevent valuable assets from being transferred away from debtors in exchange for less than fair value, leaving insufficient funds to compensate honest creditors. *See* 4 *Collier on Bankruptcy* ¶ 548.01 at 548–4 through 548–24 (15th ed. 1993) (*"Collier"*); *Lynch v. La Fonte*, 37 F.Supp. 499 (S.D.Cal. 1941); Cook, "Fraudulent Transfer Liability Under the Bankruptcy Code," 17 Hous. L.Rev. 263 (1980).[37]

Fraudulent conveyance laws favor creditors (and thereby the trustee) for three reasons. First, they are recovery statutes, designed to preserve assets of the estate. *Elliot v. Glushon*, 390 F.2d 514, 516–17 (9th Cir.1967); *Ohio Corrugating Company, et al. v. Security Pacific Business Credit, Inc., et al. (In re Ohio Corrugating Company)*, 70 B.R. 920, 927 (Bankr.N.D.Ohio 1987) (*"Ohio Corrugating I"*). Second, creditors are protected through a deliberate allocation of risk to the debtor's transferees. *See Ohio Corrugating Company v. DPAC, Inc. (In re Ohio Corrugating Company)*, 91 B.R. 430, 434 (Bankr.N.D.Ohio 1988) (*"Ohio Corrugating II"*); McCoid, "Constructively Fraudulent Conveyances: Transfers For Inadequate Consideration," 62 Tex.L.Rev. 639, 658–63 (1983).[38]

Third, favoring creditors promotes normative goals of bankruptcy law, such as good pre-petition debtor-creditor relations and the deterrence of future fraudulent transfers. *See Iannacone v. Foothill Capital Corporation (In re Hancock–Nelson Mercantile Company, Inc.)*, 95 B.R. 982, 1001 (Bankr. D.Minn.1989); Clark, "The Duties Of The Corporate Debtor To Its Creditors," 90 Harv.L.Rev. 505, 506–17 (1977). Accordingly, commercially reasonable transactions are

---

**36.** Spitters has appealed this matter to the Ninth Circuit Court of Appeals, where it is presently pending.

**37.** "A fraudulent conveyance, or, more correctly, a conveyance in fraud of creditors, may generally be defined as a transaction by means of which the owner of real or personal property has sought to place the land or goods beyond the reach of his creditors, or which operates to the prejudice of their legal or equitable rights, or a conveyance which operates to the prejudice of the legal or equitable rights of other persons, including subsequent purchasers." 37 Am. Jur.2d, *Fraudulent Conveyances* § 1 (1968).

**38.** These two rationales are closely related. *See Mixon v. Anderson, et al. (In re Ozark Restaurant Equip. Co.)*, 816 F.2d 1222 (8th Cir.), *cert. denied*, 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987) (*"Ozark Restaurant"*) (discussing the use of strong-arm and avoidance powers of trustees to increase potential assets of estate).

safer from attack than those that appear more questionable.[39]

Federal law on this subject was included in section 67(e) of the 1898 Bankruptcy Act, which copied much of its text directly from the statute of 13 Eliz. *See also* former section 70(e). In 1938, the Chandler Act replaced § 67(e) with § 67(d), which allowed for recovery of conveyances that were constructively fraudulent, made without any fraudulent intent.

In the United States, state fraudulent conveyance law in the twentieth century has been expressed through the 1918 Uniform Fraudulent Conveyance Act ("UFCA"), 7A U.L.A. 427 (1985), and its successor, the 1984 Uniform Fraudulent Transfer Act ("UFTA"), 7A U.L.A. 639. California replaced the UFCA with the UFTA in 1986, applying it to all transfers made after January 1, 1987. *See* West Ann.Cal.Civ.Code §§ 3439–3439.12 (1994) (fraudulent transfers of real property).[40]

Under the Federal Bankruptcy Code, the trustee [41] can bring a fraudulent conveyance action either under federal bankruptcy (11 U.S.C. § 548) or non-bankruptcy "applicable law" (11 U.S.C. § 544(b)).[42] Unless the trustee is successful in such an action, the transfer, no matter how fraudulent in fact, is only voidable and not void. *In re Mullen,* 101 F. 413 (D.Mass.1900); *Fitch, et al. v. Jones & Lamson Machine Co., Inc. (In re Jones & Lamson Machine Co., Inc.),* 113 B.R. 124, 127 (Bankr.D.Conn.1990). Many principles of the UFCA are built into the Bankruptcy Code. 4 *Collier* § 548.01 at 548–18 to 548–19. Unless otherwise specified, common-law authorities and case-law dealing with the UFCA, UFTA, Bankruptcy Act of 1898 or the Bankruptcy Code may be cross-referenced whatever the statutory basis of the action at bar.[43] *See, e.g., Hayes v. Palm Seedlings Partners–A (In re Agricultural Research and Technology Group, Inc.),* 916 F.2d 528, 534 (9th Cir.1990) ("*Agricultural Research*"); *Nordberg v. Arab Banking Corporation (In re Chase & Sanborn Corp.),* 904

---

**39.** *See* Posner, "The Rights Of Creditors Of Affiliated Corporations," 43 U.Chi.L.Rev. 449, 509 (1976) ("An efficient corporation law is not one that maximizes creditor protection on one hand or corporate freedom on the other, but one that mediates between these goals in a fashion that minimizes the costs of raising money for investment.")

**40.** For a table of states operating under either the UFCA or the UFTA, *see* 7A U.L.A. 108, 133 (Supp.1991).

**41.** A Debtor–in–Possession functions as a Trustee under the Bankruptcy Code. *See* 11 U.S.C. § 1107; *Upgrade Corporation v. Government Technology Services, Inc. (In re Softwaire Centre International, Inc.),* 994 F.2d 682 (9th Cir.1993) (per curiam); *Verco Indus. v. Spartan Plastics (In re Verco Indus.),* 704 F.2d 1134, 1137 (9th Cir. 1983).

**42.** Most courts have interpreted this phrase to imply the use of state law. *See, e.g., Dicello v. Jenkins (In re Int'l Loan Network, Inc.),* 160 B.R. 1, 17 n. 25 (Bankr.D.D.C.1993). However, other federal statutes could be employed. *Cf. Patterson v. Shumate,* —— U.S. ——, ——, 112 S.Ct. 2242, 2246–47, 119 L.Ed.2d 519 (1992). These laws could include the Federal Debt Collection Procedure Act, 28 U.S.C. §§ 3001 *et seq.,* or the avoidance powers of the Federal Deposit Insurance Corporation ("FDIC"). *See* 12 U.S.C. § 1821; Fellerhoff and Aicher, "Avoidance Powers Available To The FDIC In A Bank Insolvency", 1

J.Bankr.L. & Prac. 59 (1991); Sharp, "Extending The FDIC's 'Super Powers' To Its Transferees: A Vehicle For Privatizing Loss Recovery", 97 Comm.L.J. 49 (1992). *But see Hirsch v. Marinelli (In re Colonial Realty Company, et al.),* 168 B.R. 506 (Bankr.D.Conn.1994) (trustee may only employ avoidance power of single creditor for benefit of all creditors).

**43.** This Court is bound by the decisions of the U.S. Supreme Court, *Jaffree v. Board of School Commissioners,* 459 U.S. 1314, 103 S.Ct. 842, 74 L.Ed.2d 924 (1983), and the Ninth Circuit Court of Appeals, *Zuniga v. United Can Co.,* 812 F.2d 443, 450 (9th Cir.1987). When construing California law, this Court will seek the rule to which the California Supreme Court would adhere were it confronted with a similar situation. *Commercial Union Ins. Co. v. Ford Motor Co.,* 640 F.2d 210, 212·(9th Cir.), *cert. denied,* 454 U.S. 858, 102 S.Ct. 310, 70 L.Ed.2d 154 (1981). In the absence of relevant decisions from the California Supreme Court, this Court will follow the decisions of the California Courts of Appeal, *Security Pacific National Bank v. Kirkland (In re Kirkland),* 915 F.2d 1236, 1238–39 (9th Cir. 1990), unless convincing evidence exists that the California Supreme Court would decide differently. *See State Farm Fire and Casualty Co. v. Abraio,* 874 F.2d 619, 621 (9th Cir.1989) ("*State Farm*"); *Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1482 (9th Cir.1986), *modified,* 810 F.2d 1517 (1987). *Compare State Farm with Ulvestad v. Chevron U.S.A., Inc.,* 818 F.Supp. 292 (C.D.Cal.1993).

F.2d 588, 593 n. 11 (11th Cir.1990) ("*Chase & Sanborn*"); *General Electric Credit Corp. of Tennessee v. Murphy (In re Rodriguez),* 895 F.2d 725, 727 n. 2 (11th Cir.1990).[44] *See also Coder v. Arts,* 213 U.S. 223, 241–44, 29 S.Ct. 436, 443–44, 53 L.Ed. 772 (1909).

PDRA claims that the Spitters note is a fraudulent transfer under 11 U.S.C. § 544(b), applying Cal.Civ.Code § 3439.04(b), which reads:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

... without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

1) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or,

2) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

■ Good faith on the part of the creditor/transferee is nominally irrelevant for finding constructive fraud under 3439.04(b). *See U.S. v. May,* 600 F.Supp. 339, 341 (S.D.Cal.1984), *citing Headen v. Miller,* 141 Cal.App.3d 169, 172, 190 Cal.Rptr. 198 (1983) (both dealing with the UFCA), *Pereira v. Checkmate Communications Co., Inc., et al. (In re Checkmate Stereo & Electronics, Ltd.),* 9 B.R. 585, 591 (Bankr.E.D.N.Y.), *aff'd,* 21 B.R. 402 (E.D.N.Y.1982). Some sources do infer that constructive fraudulent transfer

statutes are merely ways of codifying the classic "badges of fraud," objective criteria that indicate actual fraud even when it cannot be proven directly. *See Kupetz v. Wolf,* 845 F.2d 842, 846 (9th Cir.1988) ("*Kupetz II*"); *Boston Trading Group, Inc., et al. v. Burnazos, et al.,* 835 F.2d 1504, 1509 (1st Cir.1987); *Cieri, et al.,* "An Introduction To Legal And Practical Considerations In the Restructuring Of Troubled Leveraged Buyouts," 45 Bus.Law 333, 364–67 (1989). However, the Court holds that Cal.Civ.Code § 3439.04(b) covers situations where the "fraud" was not intentional but the transfer was still inherently improper in terms of bankruptcy law and policy. *See Gough v. Titus, et al. (In re Christian & Porter Aluminum Co.),* 584 F.2d 326 (9th Cir.1978) ("*Christian & Porter*");[45] *Ferrari v. Barclays Business Credit, Inc. (In re Morse Tool, Inc.),* 108 B.R. 389, 390–91 (Bankr. D.Mass.1989); Baird & Jackson, "Fraudulent Conveyance Law," 38 Vand.L.Rev. at 832–33; Commissioner's Notes to the UFCA, 7A U.L.A. 427–28.

■ Evidentiary questions in a constructive fraudulent transfer case are decided by a preponderance of the evidence. *Ossen v. Bernatovich (In the Matter of National Safe Northeast, Inc.),* 76 B.R. 896, 901 (Bankr. D.Conn.1987); *Talbot, Jr. v. Warner (In the Matter of Warner),* 65 B.R. 512, 518–19 (Bankr.D.S.D.1986); *Emerald Hills Country Club, Inc. v. Hollywood, Inc. (In the Matter of Emerald Hills Country Club, Inc.),* 32 B.R. 408, 420 (Bankr.S.D.Fla.1983).

Actual fraud in transfers and conveyances has traditionally been proven only by clear and convincing evidence. *See Stratton v. Equitable Bank, N.A.,* 104 B.R. 713, 726 (D.Md.), *aff'd,* 912 F.2d 464 (4th Cir.1990);

---

44. Most recent fraudulent transfer litigation has arisen from unsuccessful leveraged buyouts (LBOs). *See generally* White, "Leveraged Buyouts And Fraudulent Conveyance Laws Under The Bankruptcy Code—Like Oil And Water, They Just Don't Mix," 1991 Ann.Surv.Am.L. 357 (1992); Sherwin, "Creditor's Rights Against Participants In A Leveraged Buyout," 72 Minn. L.Rev. 449 (1988). This use of the statutes has had its critics. *See* Baird & Jackson, "Fraudulent Conveyance Law and its Proper Domain," 38 Vand.L.Rev. 829, 852 (1985) ("A firm that incurs obligations in the course of a buyout does

not seem at all like the Elizabethan deadbeat who sells his sheep to his brother for a pittance.")

45. "In order to uphold the judgment voiding the transfers as fraudulent, it is only necessary to find *either* that there was no fair consideration given and Bankrupt was or was thereby rendered insolvent; *or* that there was actual intent to hinder, delay or defraud creditors." 584 F.2d at 335–36 (emphasis in original).

*Coors of North Mississippi, Inc. v. Bank of Longview (In re Coors of North Mississippi, Inc.),* 66 B.R. 845, 861 (Bankr.N.D.Miss. 1986); *Reddy v. Gonzalez,* 8 Cal.App.4th 118, 10 Cal.Rptr.2d 55 (1992). However, this rule may have been altered by the Supreme Court's ruling in the case of *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (holding that evidentiary questions involving the discharge of individual debts under 11 U.S.C. § 523 should be judged under a "preponderance" standard). *See Heartland Federal Savings & Loan Association v. Briscoe Enterprises, Ltd., II, d/b/a/ Regalridge Apartments (In the Matter of Briscoe Enterprises, Ltd., II),* 994 F.2d 1160, 1163–64 (5th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993); *Liodas v. Sahadi,* 19 Cal.3d 278, 137 Cal. Rptr. 635, 562 P.2d 316 (1977).

### C. *PUBLIC POLICY AND KUPETZ II*

■ It is logical to presume that prudent businessmen, upon learning that a company has made a questionable transfer, such as assuming a large debt or giving up a valuable asset without receiving comparable consideration, will be more hesitant in extending credit to that company from then on.[46] This presumption has often hardened into a judicial rule that parties who became creditors (of the transferor/debtor) *with prior knowledge of the transfer* (actual or constructive) could not challenge that transfer *post facto* on the grounds of constructive fraud (in the absence of actual fraud on the part of the debtor). *See, e.g., State ex rel. v. Nashville Trust Co., et al.,* 28 Tenn.App. 388, 418, 190 S.W.2d 785, 797 (1944). The rule has been based on the belief that creditors should bear some responsibility for overseeing the activities of debtors to whom they have extended credit.[47]

In the present case, PDRA's unsecured creditors[48] all had their claims mature *after* the Spitters loan agreement. Do they have standing to avoid the obligation?

Within the Ninth Circuit, five cases have examined, *inter alia,* the ability of post-transfer creditors to challenge a constructively fraudulent conveyance.[49] The court of appeals itself first ruled on this issue in *Kupetz II* in 1988. In that case, the debtor, Wolf & Vine, had previously been owned 50% by Morris Wolf ("Wolf") and 50% by the Marmon Group, Inc. ("Marmon"). Wolf announced his impending retirement, and Marmon, already bound to purchase Wolf's interest in that situation, began looking for a buyer for the entire firm. Through an LBO, David Adashek ("Adashek"), a man backed by the Continental Illinois National Bank ("Bank"), took control of the company.

Adashek formed a shell corporation, purchased both Wolf's and Marmon's shares for $3 million ($1.1 million in cash and $1.9 million in installment payments over two years), borrowed the $1.1 million from the Bank and obtained letters of credit (from the Bank) for the remainder, merged his shell into Wolf &

---

**46.** *See Emde v. Dress,* 215 Cal.App.3d 1124, 264 Cal.Rptr. 184, 189 (1989). Although the California Supreme Court has ordered that this case not be officially cited as precedent, this does not obviate the value of the case's statement of facts. The Court places no reliance upon this case in any event.

**47.** *See Ohio Corrugating II,* 91 B.R. at 435 ("We see no basis here for holding that the constructive fraud provisions of 11 U.S.C. § 548 may be utilized as a form of insurance for creditors whose claims matured after the buyout."); *Credit Managers Association of Southern California v. The Federal Company,* 629 F.Supp. 175, 181 (C.D.Cal.1985) (*"Credit Managers"*) ("Credit could liberally be extended to such companies regardless of their assets or cash flow with the knowledge that the buyout could always be attacked later if the company folded."); Baird & Jackson, "Fraudulent Conveyance Law," 38 Vand.L.Rev. at 840 (arguing that the broad application of fraudulent conveyance law to LBO's "does not provide an incentive for creditors to do the monitoring they are capable of doing.").

**48.** Small trade creditors, with relatively little economic bargaining power, are usually the parties left at the mercy of a questionable transfer. *See* Liss, "Fraudulent Conveyance Law and Leveraged Buyouts," 87 Colum.L.Rev. 1491, 1512 (1987).

**49.** *Lippi v. City Bank,* 955 F.2d 599 (9th Cir. 1992) (*"Lippi"*); *Kupetz v. Continental Illinois National Bank and Trust Co.,* 77 B.R. 754 (C.D.Cal.1987) (*"Kupetz I"*), *aff'd sub nom., Kupetz v. Wolf,* 845 F.2d 842 (9th Cir.1988) (*"Kupetz II"*); *Credit Managers,* 629 F.Supp. 175; *Kendall v. Sorani (In re Richmond Produce Co.),* 151 B.R. 1012 (Bankr.N.D.Cal.1993).

Vine, and finally had Wolf & Vine pledge all of its assets to the Bank as security for the loans. "Thus, Adashek effectively pledged the assets of Wolf & Vine to finance his acquisition of that corporation." *Kupetz II*, 845 F.2d at 844.

All was well, until the new Wolf & Vine was unable to service its debt. It went into bankruptcy, still owing considerable sums to the Bank, Wolf and Marmon. The debtor's chapter 7 trustee filed suit against all three and Adashek under, *inter alia*, 11 U.S.C. § 548 and the California Fraudulent Conveyance Act, former Cal.Civ.Code § 3439.04, claiming that the purchases of Wolf's and Marmon's stock represented fraudulent transfers that deprived Wolf & Vine's unsecured creditors from recovery on their claims. *Id.* The Bank and Adashek settled with the trustee, leaving Wolf & Marmon as the sole defendants at trial.

Through a combination of summary judgments and directed verdicts, *see Kupetz II*, 845 F.2d at 844–45, the district court ruled in favor of the defendants on all counts. *Kupetz I*, 77 B.R. 754. Based on four factors, the Ninth Circuit affirmed. *Kupetz II*, 845 F.2d at 847–48. These were: 1) there was no evidence of intent to defraud (by Wolf and/or Marmon); 2) the selling shareholders did not know about the leveraging of the purchase; 3) the trustee did not represent any pre-transfer creditors; and 4) the form of the transactions was proper, *i.e.*, the stock was purchased either with cash or irrevocable letters of credit as opposed to "a serial redemption by Wolf & Vine of its own stock." *Id.* at 850. The court of appeals specifically held that despite the language of the statute allowing post-transfer creditors standing to challenge a conveyance as constructively fraudulent, "we believe this grant of standing to sue must be modified in light of an LBO in which there was no actual intent to defraud.... [f]uture creditors may not complain when they knew or could easily have found out about the transaction." *Id.* at 849–50 n. 16.

The *Kupetz II* court referred on multiple occasions to the different nature of "secret" and "well-publicized" transfers. In seizing upon this distinction, the *Kupetz II* court specifically relied upon the prior decisions of Judge Rafeedie, who had been the trial judge for both *Kupetz I* and *Credit Managers*. *See id.* at n. 16. However, this holding, as well as the rest of the *Kupetz II* decision, has been strongly criticized. *See, e.g.*, Weinstein, "From *Kupetz* to *Lippi* and Beyond: LBO's in the Ninth Circuit—Now What?," 21 Cal. Bankr.J. 169 (1993) ("Now What?").

The court of appeals re-examined the issue of the standing of post-conveyance creditors to challenge a constructively fraudulent transfer in the *Lippi* case, 955 F.2d 599. In this case, one of the debtor's director/shareholders, Russell, tried to buy out his two colleagues. Russell formed a shell holding company, borrowed the acquisition price from various lenders (including a Small Business Administration loan through City Bank), and purchased the outstanding shares. The debtor signed for the loan and therein encumbered all of its assets. By the time that the debtor was involuntarily forced [50] into bankruptcy three years later, all of the lenders for the LBO purchase had been repaid. *Lippi*, 955 F.2d at 603.

The trustee sued to recover fraudulent, preferential and post-petition transfers. *See* 11 U.S.C. §§ 544(b), 547, 549. The district court granted summary judgment for the defendants, relying on *Credit Managers* and *Kupetz II* for the holding that "the trustee has standing to sue on behalf of those creditors whose claims arose subsequent to the challenged transactions, only if the trustee has produced evidence of actual fraud sufficient to withstand each defendant's motion for summary judgment." *Lippi*, 955 F.2d at 606. The court of appeals had no quarrel with this statement of the law. *Id.* at 606–607,[51] but reversed the district court's grant

---

50. *See* 11 U.S.C. 303.

51. The Court of Appeals also noted that, as opposed to the tension between the *Kupetz II* decision and California statutory law, the Hawaiian common law of fraudulent conveyances did not support the right of post-transfer creditors to challenge a transaction on constructive fraud grounds in the absence of fraud, secrecy or "new and hazardous business." *Lippi*, 955 F.2d at 606–7. *See Metzger v. Lalakea*, 32 Haw. 706 (1933).

of summary judgment on the ground that the lower court had misinterpreted *Kupetz II.*

The district court had ruled that the trustee had not presented any evidence that any of the defendants (with the exception of Russell) had the intent to defraud the unsecured creditors. The *Lippi* court noted that the inquiry (as to intent and/or secrecy) should be directed at the nature of the *transaction* itself, not the individual defendants. *Lippi*, 955 F.2d at 607. Accordingly, the lack of actual fraud on the part of an individual defendant should not have been determinative in so far as avoiding the transfer itself.[52] The case was remanded for further proceedings.

The only bankruptcy court case to discuss this issue is also the most recent decision, *Richmond Produce*, 151 B.R. 1012. In this LBO, the owners of the debtor, the Soranis, agreed to sell most of their stock to John Clow ("Clow") for $2 million in cash and a $2 million promissory note, payable at $25,000/ month plus interest. The debtor would also redeem the Sorani's remaining stock for $1 million. *Richmond Produce*, 151 B.R. at 1014.

As the closing date approached, the Soranis insisted on a letter of credit to secure Clow's note. Clow then went through the following financial ballet:

1. Mechanics Bank funded a $1.5 million line of credit to the debtor secured by its assets.

2. The debtor wrote a business check to the Bank of California ("BanCal"), which it delivered to Mechanics Bank, in exchange for which Mechanics Bank issued a cashier's check payable to BanCal.

3. Clow used the cashier's check to buy a certificate of deposit ("CD") at BanCal in his own name.

4. Clow pledged the CD to BanCal and BanCal issued a letter of credit for the benefit of the Soranis.

When the debtor eventually defaulted, the Soranis called the letter of credit and BanCal absorbed the CD. This left the Soranis and BanCal virtually paid in full, Clow owning the stock and the debtor out the $1.5 million.[53] *See Richmond Produce*, 151 B.R. at 1014–16; Weinstein, "Now What?", 21 Cal. Bankr.J. at 194.

In a detailed decision, Judge Tchaikovsky analyzed a variety of arguments as to the specific elements of the transfer that constituted value to the debtor, and what was the debtor's financial status both before and after the transfer.

The *Richmond Produce* trustee had sued under both Cal.Civ.Code § 3439.04(b) (the same statute involved in this case) and Cal. Civ.Code § 3439.05. The court noted that under Cal.Civ.Code § 3439.05, a challenging creditor had to have a mature claim at the time of the transfer, and that the *Kupetz II* court had inferred a similar requirement for 11 U.S.C. § 548(a)(2). However, Judge Tchaikovsky also noted that Cal.Civ.Code § 3439.04(b) did not include such a prerequisite. *Richmond Produce*, 151 B.R. at 1016 n. 5. Accordingly, even if the trustee had not been able to present a pre-transfer creditor, which he could, the case could have proceeded at least under Cal.Civ.Code § 3439.04(b).[54]

At least one commentator has noted that "[i]t is particularly noteworthy that a judge in the Ninth Circuit could and did write a complete analysis of an LBO litigation matter while hardly mentioning the *Kupetz* decisions or *Credit Managers* at all." Weinstein, "Now What?", 21 Cal.Bankr.J. at 196. The issue that distinguished those cases, the standing of post-transfer creditors in a constructively fraudulent conveyance, only ap-

---

**52.** The court noted that questions of the knowledge and/or intent of the individual defendants would still have been potentially relevant in terms of recovery from transferees, under 11 U.S.C. § 550. *See Lippi*, 955 F.2d at 607 n. 11.

**53.** In addition, Mechanics Bank likely foreclosed on its collateral, leaving the debtor nothing more than a corporate fiction.

**54.** The *Kupetz II* court did note that its case was brought both on the basis of 11 U.S.C. § 548 and the *former* Cal.Civ.Code § 3439.05 (which was extremely similar in language to the present Cal. Civ.Code § 3439.04(b)), and that the Court of Appeals explicitly made its ruling applicable to both statutes. *See Kupetz II*, 845 F.2d at 845.

pears in a footnote. *See Richmond Produce,* 151 B.R. at 1016 n. 5.

Weinstein concludes his article in the California Bankruptcy Journal with the argument that *Richmond Produce,* though hewing to the language of the statute, is in conflict with the holding of the Ninth Circuit in *Kupetz II* and *Lippi. See* Weinstein, "Now What?", 21 Cal.Bankr.J. at 196–98.

This Court is bound both by the California statutory law and the decisions of the United States Court of Appeals for the Ninth Circuit.[55] However, even if they are in conflict as Weinstein suggests, it is not necessary to choose between them in the case at bar. The *Kupetz II* decision repeatedly emphasized the "well-publicized" nature of the LBO involved in that case, as opposed to the secret maneuvers in other cases which had warranted avoidance. *See Kupetz II,* 845 F.2d at 846–50. The *Lippi* court picked up on this emphasis, by distinguishing between the nature of the entire transaction and that of the individual defendants. *Lippi,* 955 F.2d at 607. Even in light of the restrictions of *Credit Managers, Kupetz II* and *Lippi* on the standing[56] of post-transfer creditors, PDRA may proceed with its avoidance action against the Spitters obligation.

The record is replete with instances of the covert nature of this transaction, whether such covertness was deliberate or not.[57] The Spitters note was not carried on PDRA's accounting books. The assets on which Spitters claimed a security interest were not transferred to PDRA until over a year after the loan agreement was signed. The fact that Spitters had made a loan to HBK was not secret, but this would not have alerted a future creditor that PDRA was also liable for its repayment.

Spitters makes several arguments on this issue. First, he posits that based on the chain of title, PDRA's creditors could not

have relied upon the Office Building, free and clear of Spitters' claim, as an asset, as they had no knowledge that PDRA had any interest in it until the actual transfer of the building. However, this is not the relevant issue. PDRA's creditors relied on their belief that PDRA did not owe $1 million to Spitters, especially not payable within a few months, and these facts were concealed by the delayed transfer of the Office Building and the lack of other documentation. To the best of the knowledge of PDRA's creditors, PDRA did not have title to the Office Building, but neither did it owe $1 million to Spitters. Moreover, the fact that the $1 million was due and payable *within a few months* was critical financial information withheld from PDRA's creditors.

In the alternative, Spitters argues that PDRA's creditors could have constructively relied upon the Office Building (with the accompanying Spitters Deed of Trust) as an asset of HBK, and thereby an asset of PDRA. However, the fact that HBK held title to the Office Building was of no benefit to the creditors of PDRA. Benefits paid to parent companies for transfers of their subsidiaries are presumed to be of nominal value to those subsidiaries in the absence of specific proof to the contrary. *Murray v. Prescott, Ball & Turben, Inc. (In re Chicago, Missouri & Western Railway Company),* 124 B.R. 769, 773 (Bankr.N.D.Ill.1991) ("*Western Railway*"); *Heritage Bank Tinley Park v. Steinberg (In re Grabill Corp.),* 121 B.R. 983 (Bankr.N.D.Ill.1990) ("*Grabill Corp.*"); *Garrett v. Falkner (In re Royal Crown Bottlers of North Alabama, Inc.),* 23 B.R. 28, 30 (Bankr.N.D.Ala.1982) ("*Royal Crown*"). *Contra Telefest, Inc. v. VU–TV, Inc.,* 591 F.Supp. 1368, 1379 (D.N.J.1984) ("*Telefest*").

The only "public" document which might have provided a clue to the nature of PDRA's

---

**55.** *See* n. 43, *supra.*

**56.** The term "standing" has been used in the prior decisions cited, *supra,* to describe the availability of certain creditors' claims to support a trustee's fraudulent transfer action. But the *Kupetz II* holding does not really deal with standing, but rather "concerns over whether the plaintiff trustee could prove one of the elements of his case, namely, that to invoke section 544(b) there

must be an actual unsecured creditor in existence that could have avoided the transfer." Weinstein, "What Now?", 21 Cal.Bankr.J. at 192.

**57.** The Court holds in this Decision, *infra,* that Spitters acted in good faith in his dealings with PDRA. It makes no such decision for Kelley one way or the other.

liability was the UCC–1 filing by Spitters, regarding his claimed security interest in HBK's contract rights to use the new Conference Center. PDRA was listed as an "additional debtor". However, as of this time, HBK had not even attempted to transfer the Conference Center rights to PDRA. The UCC–1 filing did not mention the Office Building, nor the extent of the debt to Spitters, nor the repayment terms. No creditor viewing this document could reasonably infer that PDRA owed $1 million to Spitters that was due within just a few months.

The Court holds that as PDRA's obligation to Spitters was objectively secretive, post-transfer creditors did not have constructive notice of its existence, and therefore their claims may be used to support an action under 11 U.S.C. § 544(b).

### D. REASONABLY EQUIVALENT VALUE

■ In order to maintain a fraudulent transfer action and avoid its obligation to Spitters, PDRA has the burden of showing that it did not receive reasonably equivalent value in exchange. *Chase & Sanborn*, 904 F.2d at 593–94; *Ellenberg v. Chapel Hill Harvester Church, Inc. (In the Matter of Moses)*, 59 B.R. 815, 817–18 (Bankr.N.D.Ga. 1986); *Parlon v. Claiborne (In re Kaylor Equipment & Rental, Inc.)*, 56 B.R. 58, 61 (Bankr.E.D.Tenn.1985). Determining this point is a legal decision, reviewable *de novo*. *Maddox v. Robertson (In re Prejean)*, 994 F.2d 706, 708 (9th Cir.1993) ("*Prejean*"). However, "[w]hether fair consideration has been given for a transfer is largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts." *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 829–30 (5th Cir.1959), *reh'g denied*, 274 F.2d 320 (5th Cir.1960), *cert. denied*, 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877 (1960). *See also Patterson v. Missler*, 238 Cal.App.2d 759, 48 Cal.Rptr. 215, 221 (1966) ("*Patterson*").

■ Whether PDRA received reasonably equivalent consideration is determined from the perspective of the creditors of the estate. *Prejean*, 994 F.2d at 708; *In re Consolidated Capital Equities Corp.*, 143 B.R. 80 (Bankr.N.D.Tex.1992); *Patterson*, 238 Cal.App.2d at 766, 48 Cal.Rptr. at 220. The analysis is directed at comparing what the *debtor* surrendered and what the *debtor* received. *Wyle v. C.H. Rider & Family, et al. (In re United Energy Corp.)*, 944 F.2d 589, 597 (9th Cir.1991); *Consove v. Cohen (In re Roco Corporation)*, 701 F.2d 978, 982 (1st Cir.1983) ("*Roco*"); *Sorenson, Jr. v. Tire Holdings Limited Partnership (In re Vinzant)*, 108 B.R. 752, 759 (Bankr.D.Kan.1989).

■ All assets involved in the contested transfer should be measured at their market value at the time of transfer. *In re Ozark Restaurant Equipment Co., Inc.*, 850 F.2d 342, 344–45 (8th Cir.1988). Neither appreciation nor depreciation in the value of the assets after the transfer affects the calculation of consideration. *Greene v. Newman (In re Newman)*, 15 B.R. 658, 660 (S.D.N.Y. 1981); 4 *Collier* ¶ 548.09 at 548–116. Consideration paid after the transfer must also be excluded unless it was part of the original bargain. *In re Messenger*, 32 F.Supp. 490, 494 (E.D.Pa.1940); 4 *Collier* ¶ 548.09 at 548–116.

It is undisputed that Spitters paid $1 million (in 6 installments) to HBK. Did this transfer, by itself, constitute reasonably equivalent consideration? Spitters puts forward several legal theories in support of such a determination. However, none of them are sufficient for the case *sub judice*.

#### 1. Promissory Note

■ "Under California law, proof of the execution of a promissory note raises a rebuttable presumption that the note is supported by consideration. Cal.Civ.Code § 1614. The burden of showing lack of consideration lies with the challenging party. Cal.Civ.Code § 1615." *Cooper v. Allustiarte (In re Allustiarte)*, 786 F.2d 910, 916 (9th Cir.), *cert. denied*, 479 U.S. 847, 107 S.Ct. 169, 93 L.Ed.2d 107 (1986).

Spitters argues that the promissory note, of which PDRA was a co-maker, establishes *prima facie* that PDRA received $1 million. However, the note only raises a rebuttable presumption, and PDRA already has the burden of showing that it did not receive reasonably equivalent value. *Chase & Sanborn*,

904 F.2d at 593–94. This argument is thus superfluous.

### 2. *Indirect Value*

It has become a general rule during the 1980's that benefits, consideration for transfers, could accrue to a debtor through indirect, third-party routes, not just in a direct exchange with the challenged transferee. This is called the *"Rubin"* rule. *See Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979, 991–94 (2nd Cir.1981). *See also Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635 (3rd Cir.1991); *In the Matter of Xonics Photochemical, Inc.,* 841 F.2d 198 (7th Cir.1988). Under this rule, some clear and tangible benefit to the debtor must still consequently result from the payment by the transferee. *United States v. Gleneagles Investment Co., Inc.,* 565 F.Supp. 556 (M.D.Pa.1983) (*"Gleneagles I"*), *affirmed sub nom., United States v. Tabor Court Realty Corp.,* 803 F.2d 1288 (3rd Cir.1986) (*"Tabor Court"*), *cert. denied sub nom., McClellan Realty Co. v. United States,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); *Vadnais Lumber Supply, Inc. v. Byrne, et al. (In re Vadnais Lumber Supply, Inc.),* 100 B.R. 127 (Bankr.D.Mass.1989) (*"Vadnais Lumber"*); *McColley v. Rosenberg (In re Candor Diamond Corp.),* 76 B.R. 342, 349 (Bankr.S.D.N.Y.1987); *Ohio Corrugating I,* 70 B.R. at 927. Benefits paid to parent companies for transfers of their subsidiaries are presumed to be of nominal value to that subsidiary in the absence of specific proof to the contrary. *Western Railway,* 124 B.R. at 773; *Grabill Corp.,* 121 B.R. 983; *Royal Crown,* 23 B.R. at 30. *Contra Telefest,* 591 F.Supp. at 1379.

The *Rubin* rule has been explicitly applied in several bankruptcy courts within this Circuit. *See Gill v. Brooklier (In re Burbank Generators, Inc.),* 48 B.R. 204, 206–07 (Bankr.C.D.Cal.1985); *Howco Leasing Corporation v. Alexander Dispos–Haul Systems Inc. (In re Alexander Dispos–Haul Systems, Inc.),* 36 B.R. 612, 616 (Bankr.D.Or.1983). One older Ninth Circuit case, *Williams v. Twin City Company,* 251 F.2d 678 (9th Cir. 1958), also seems to support the *Rubin* rule.

Was the transfer to HBK indirectly beneficial to PDRA? The parties agree that money was being "upstreamed" from PDRA to HBK. It could be argued that the $1 million from Spitters equaled $1 million that would have been, but was not, siphoned out of PDRA by its corporate superior. No evidence was presented that could reasonably support such a claim. Thus, this claim is not made, probably because PDRA did not have an extra million (aside from the Spitters funds allegedly used for construction) to divest without it going into bankruptcy much sooner than it actually did. In any case, a straight *Rubin* analysis will not prove that PDRA received reasonably equivalent value.

### 3. *Agency*

Spitters claims that HBK was PDRA's agent, and thus through the delivery of the $1 million to HBK, it was constructively delivered to PDRA, and any misdirection of funds by HBK cannot be imputed to Spitters.

Spitters claims that Kelley was authorized to act on behalf of both HBK and PDRA, that Kelley decided that the loan proceeds should be first disbursed to HBK, and that Spitters correctly followed this instruction and thus delivered $1 million to PDRA. This argument has initial appeal, but ultimately is not dispositive in the instant case.

The California fraudulent transfer statute clearly states that unless it is specifically displaced by an element of the statute itself, other commercial law, including the law of agency, supplements fraudulent transfer jurisprudence. Cal.Civ.Code § 3439.10. An agent represents his principal in dealings with third-persons. Cal.Civ.Code § 2295. Anyone with legal capacity may appoint an agent, and anyone may be an agent. Cal. Civ.Code § 2296. Determining whether someone is an agent is a question of fact. *Associated Creditors' Agency v. Haley Land Co.,* 239 Cal.App.2d 610, 49 Cal.Rptr. 1 (1966); *Pagan v. Spencer,* 104 Cal.App.2d 588, 232 P.2d 323 (1951).

It is established that if an agent has authority to receive or collect payment, giving money to that agent is equivalent to

payment to the principal himself. *Navrides v. Zurich Ins. Co.,* 5 Cal.3d 698, 706, 97 Cal.Rptr. 309, 488 P.2d 637 (1971); *Burgess v. Security–First Nat. Bank,* 44 Cal.App.2d 808, 113 P.2d 298 (1941); 3 Cal.Jur. § 125 at 175 (3rd ed. 1973); 49 A.L.R.3d 843 (1973); 2 Witkin, *Summary of California Law,* Agency § 85 at 87 (9th ed. 1987) ("*Summary* "). *See also* Restatement (Second) of Agency § 144 (1958); 3 Am.Jur.2d, Agency § 270 (1986) ("*qui facit per alium facit per se* "). The burden of proof is on the third-party to show that the agent had the authority. *Schomaker v. Petersen, et al.,* 103 Cal.App. 558, 285 P. 342 (1930). If the third-person knew or suspected that the agent had no authority and/or was defrauding the principal, then the transfer is not binding on the principal. Cal. Civ.Code § 2306, 2 Witkin, *Summary,* Agency § 78 at 80–81.

There was no evidence presented at trial of a written agency agreement between HBK and PDRA. Spitters' argument is based on the executive authority of Kelley (over both corporations) to direct, both orally and in the loan agreement, that HBK receive the money on behalf of both loan co-makers.

PDRA's first response to this argument is that no agency relationship existed at the time of the Spitters loan, that Kelley just made it up when this litigation was instigated. Without regard to when Kelley first attached the title "agency" to the PDRA/HBK relationship in terms of the receipt of the Spitters loan funds, the evidence is undisputed that Kelley had executive authority over both HBK and PDRA. Kelley also controlled the cash flows of both corporations, and Kelley specifically told Spitters to send the money to HBK. With these facts in mind, it is fairly irrelevant whether Kelley convened a meeting of the board of directors of either company to "rubber-stamp" his decision. The Court finds, as a matter of fact, that Kelley did designate HBK as PDRA's agent for the purpose of receiving any interest that PDRA might have had in the Spitters funds.

Next, PDRA argues that Spitters did not act in good faith, that he knew, or should have known, that HBK would not pass the loan funds on to PDRA (but would still leave PDRA liable for repayment of the note). Reference is made to Spitters' prior business and personal relationships with Kelley, and Spitters' education and experience in this type of transaction. However, the evidence is not persuasive. Witnesses at trial (Cox, Maggio, Kelley, Spitters) uniformly testified that Spitters had no knowledge of the upstreaming of funds at the time of the loan agreement. The prior good relationship of Spitters and Kelley may have made it more likely that Spitters would consider making the loan, but there is no evidence before the Court that he considered the money a gift to Kelley, or that he did not expect to be repaid at the end of the original eight-month term.

Credible testimony establishes both that Kelley planned to attempt to refinance the Office Building after finishing its construction, and that Spitters expected the timely return of his principal through either this refinancing, the sale of properties to raise cash, or PDRA's continued operations at Pajaro Dunes.[58] Spitters was also likely relying on the co-debtor status of HBK, and his belief that HBK (or Kelley personally) was solvent enough to pay the $1 million to protect PDRA if PDRA did not have available cash reserves. Finally, there is no evidence that on May 1, 1989, Spitters knew or could have known that the Office Building and Conference Center rights would have been worth significantly less than $1 million to PDRA.

The question is "solely whether the grantee knew or should have known that he was not trading normally but that on the contrary, the purpose of the trade, as far as the debtor was concerned, was the defrauding of his creditors." *Gallant v. Kanterman, et al. (In re Kanterman),* 97 B.R. 768, 779 (Bankr. S.D.N.Y.), *aff'd,* 108 B.R. 432 (S.D.N.Y.1989) (*quoting Coleman v. Home Savings Associa-*

---

**58.** Spitters testified that, at the time of the loan agreement, he considered HBK's license to operate the rental business a "gold mine." In his testimony, Kelley specified either refinancing or the sale of property as his intended modes of repayment, but did not mention repayment from PDRA's operations. Repayment from PDRA's operations would likely have required a restructuring of the agreement with Spitters to extend the loan over a longer period of time.

tion (In re Coleman), 21 B.R. 832, 836 (Bankr.S.D.Tex.1982)). *See also Agricultural Research,* 916 F.2d at 535–36; *Bonded Financial Services v. European American Bank,* 838 F.2d 890, 897–98 (7th Cir.1988). The Court finds that Spitters acted in good faith throughout this transaction, and that he did not know, actually or constructively, about any actions on the part of HBK and/or PDRA that would lead to either the misdirection of the loan funds away from PDRA or the defrauding of its creditors.

This does not mean that a simple application of agency law will resolve the case. PDRA's second argument in opposition promotes the idea that even if Spitters wasn't acting in bad faith according to the classic definition of the term, the close relationship between Spitters, Kelley, HBK and PDRA should mitigate against the use of a rigid rule of principal-liability, especially in the context of a potentially fraudulent transfer. This argument is more persuasive, at least in consideration of the unique facts of this case.

The present action, though employing the statutory device of Cal.Civ.Code § 3439.04(b), is actually being brought under the aegis of 11 U.S.C. § 544(b), a federal statute. Accordingly, while state law may strongly influence the Court, it is not as binding as if the case had arisen through diversity jurisdiction under the rule of *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Federal law may "control the appropriateness of redress despite the provisions of state ... law ..." *Burks v. Lasker,* 441 U.S. 471, 99 S.Ct. 1831, 1836, 60 L.Ed.2d 404 (1979) *(quoting J.I. Case Co. v. Borak,* 377 U.S. 426, 434, 84 S.Ct. 1555, 1561, 12 L.Ed.2d 423 (1964)). *See also Bast v. Orange Meat Packing Co., Inc., et al. (In re G & L Packing Co., Inc.),* 41 B.R. 903, 909 (N.D.N.Y.1984).

Bankruptcy courts in particular may often modify state law rights when they conflict

with the policies advanced by the Bankruptcy Code.[59] For example, state laws often limit the time for curing defaults and accelerations of home mortgage debt, but federal courts have consistently interpreted 11 U.S.C. § 1322(b)(2)[60] to allow Chapter 13 debtors to cure prepetition defaults without regard to these limits. *See Jim Walter Homes, Inc. v. Spears (In re Thompson),* 894 F.2d 1227 (10th Cir.1990); *Downey Savings and Loan Association v. Metz (In re Metz),* 820 F.2d 1495 (9th Cir.1987). Bankruptcy courts also often look to the facts of a transaction, rather than its state law titles, to determine its proper validity. *See, e.g., Shaver v. Shaver,* 736 F.2d 1314, 1316 (9th Cir.1984) (obligations resulting from divorce judgment should be independently examined by bankruptcy court as to whether they are property divisions or support orders for purposes of 11 U.S.C. § 523(a)(5) exceptions to discharge).

Finally, courts often may exercise discretion with regard to the application of potentially-dispositive legal principles whose effects are not always merited by the facts actually presented at trial. For example, while the availability of collateral estoppel is a mixed question of law and fact in which the legal issues predominate, subject to *de novo* review, the actual application of the doctrine is subject to the discretion of the Court. *See Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 331, 99 S.Ct. 645, 651–52, 58 L.Ed.2d 552 (1979); *Clark v. Bear Stearns & Co., Inc.,* 966 F.2d 1318, 1320 (9th Cir.1992); *Dixie National Life Insurance Co. v. McWhorter, et al. (In the Matter of McWhorter),* 887 F.2d 1564, 1566 (11th Cir.1989); *Garrett v. City & County of San Francisco,* 818 F.2d 1515, 1520 (9th Cir.1987) *(citing Mack v. South Bay Beer Distrib., Inc.,* 798 F.2d 1279, 1282 (9th Cir.1986)).

PDRA argues that if Spitters' agency argument is accepted by the Court, it will vitiate all fraudulent transfer litigation. This

---

**59.** A major exception exists with regard to questions concerning the validity of liens and security interests. *See Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Stellwagen v. Clum,* 245 U.S. 605, 613, 38 S.Ct. 215, 217, 62 L.Ed. 507 (1918).

**60.** "... (b) Subject to subsections (a) and (c) of this section the plan may—... (2) modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence,* or of holders of unsecured claims, or leave unaffected the rights of holder of any class of claims; ..." (emphasis added).

is an overstatement. Due to the good faith requirement, agency law cannot provide a defense to an actually fraudulent transfer. It only takes on significance here due to the unique facts of this case. If Spitters had handed the money over to an escrow company on PDRA's orders, and that company had embezzled the funds, there would be little question that Spitters would have delivered reasonably equivalent value. However, in the case at bar, the "agent" was no hireling of the "principal", but rather its owner (and co-debtor on the note). This alone should raise questions about the "ear-marks" of the deal,[61] even if it does not rise to the level (at least for Spitters back in 1989) "that would cause a reasonable person to investigate whether the transfer would be avoidable." *Robinson v. Home Savings of America (In re Concord Senior Housing Foundation)*, 94 B.R. 180, 183 (Bankr.C.D.Cal.1988).

This is a court of equity.[62] Based on the facts of this case, it would be inequitable to apply directly the law of agency and find that PDRA received reasonably equivalent value for its obligation on the Spitters note through Spitters delivery of $1 million to PDRA's nominal agent, HBK.

### 4. Alter-ego

■ Spitters argues that HBK and PDRA enjoyed an "alter-ego" relationship, such that a transaction with one was the same as a deal with both. If so, then by transferring $1 million to HBK, Spitters also provided that sum to PDRA, and thus delivered reasonably equivalent value to PDRA.

■ This argument is also known as "piercing the veil," where an innocent party will attack the corporate form and attempt to compel recovery directly from the individuals or controlling interests behind that form. *See* 9 Witkin, *Summary*, Corporations § 12 at 524–26 (9th ed. 1989). The issue is not whether the corporate entity should be disregarded for all purposes or whether the purpose of the corporation was to defraud, but rather "whether in the particular case presented and for the purposes of such case justice and equity can best be accomplished and fraud and unfairness defeated by a disregard of the distinct entity of the corporate form." *Kohn v. Kohn*, 95 Cal.App.2d 708, 718, 214 P.2d 71 (1950). Veil-piercing should rest on the effect that the "manner of doing business has on the particular transaction involved." *Swanson v. Levy*, 509 F.2d 859, 862 (9th Cir.1975).

■ State law controls whether the bankruptcy court finds alter ego. *Christian & Porter*, 584 F.2d at 337–38. *Accord Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979). This finding is a question of fact. *Jack Farenbaugh & Son v. Belmont Construction, Inc.*, 194 Cal.App.3d 1023, 1032, 240 Cal. Rptr. 78 (1987) ("*Farenbaugh*"). The California test has two elements: "1) that there be such unity of interest and ownership that the separate personalities [of the two corporations] no longer exist, and 2) that, if the acts are treated as those of the [subservient] corporation alone, an inequitable result will follow." *Mesler v. Bragg Management Co.*, 39 Cal.3d 290, 300, 216 Cal.Rptr. 443, 448,

---

**61.** *See Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). "The essence of the test [of a good faith transaction between a debtor or stockholder and a corporation] is whether or not under all the circumstances the transaction carries the earmarks of an arms-length bargain. If it does not, equity will set it aside." 308 U.S. at 306–7, 60 S.Ct. at 245.

**62.** "[C]ourts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity." *Local Loan Co. v. Hunt*, 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934). "[B]ankruptcy itself is an equitable proceeding in which equity operates within the terms of the Bankruptcy Code." *Cukierman v. Mechanics Bank of Richmond (In re J.F. Hink &*

*Son)*, 815 F.2d 1314, 1318 (9th Cir.1987). *See also Knox v. Lines*, 463 F.2d 561, 563 (9th Cir. 1972).

This does not mean that bankruptcy courts must not follow statutory law as closely as any other court of equity. *See Shoreline Concrete Co., Inc. v. United States (In re Shoreline Concrete Co., Inc.)*, 831 F.2d 903, 905 (9th Cir.1987). "[E]quity follows the law." *Hedges v. Dixon County*, 150 U.S. 182, 192, 14 S.Ct. 71, 74, 37 L.Ed. 1044 (1893) ("*Hedges*"). Courts of equity are bound to follow express statutory commands to the same extent as are courts of law. *Hedges*, 150 U.S. at 192, 14 S.Ct. at 74–75; *Rees v. City of Watertown*, 86 U.S. (19 Wall.) 107, 122, 22 L.Ed. 72 (1873).

702 P.2d 601 (1985) ("*Mesler*"). *See also NEC Electronics v. Hurt*, 208 Cal.App.3d 772, 777, 256 Cal.Rptr. 441 (1989) ("*NEC*"). This test "is easy to state but difficult to apply." *Talbot v. Fresno–Pacific Corp.*, 181 Cal.App.2d 425, 432, 5 Cal.Rptr. 361 (1960) ("*Talbot*"). It is very fact-specific, based upon equity, and should not be tightly bound by precedent. *Farenbaugh*, 194 Cal.App.3d at 1033; *McLaughlin v. L. Bloom Sons Co., Inc.*, 206 Cal.App.2d 848, 853, 24 Cal.Rptr. 311 (1962). It should be approached with caution. *Cascade Energy and Metals Corp. v. Banks*, 896 F.2d 1557, 1576 (10th Cir.), *cert. denied sub nom., Weston v. Banks*, 498 U.S. 849, 111 S.Ct. 138, 112 L.Ed.2d 105 (1990). Relevant examples of this process include an alter-ego subsidiary with "no mind of its own," *Interocean Shipping Co. v. National Shipping & Trading Corp.*, 523 F.2d 527, 539 (2nd Cir.), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1975), and the methodical stripping of assets out of the subsidiary. *Las Palmas Associates v. Las Palmas Center Associates*, 235 Cal.App.3d 1220, 1 Cal.Rptr.2d 301 (1991) ("*Las Palmas*").

Spitters makes a strong argument that for all of Maggio's day-to-day control over PDRA's rental and catering operations, it was Kelley who truly exercised personal, and virtually unlimited control over both corporations (PDRA and HBK). PDRA's own evidence supports the conclusion that it often was nothing more than an adjunct of HBK. Specifically, cash was upstreamed without tangible or realistic consideration, HBK set the values of its non-cash transactions with PDRA, and HBK controlled PDRA's accounting procedures. Maggio testified that PDRA would sometimes pay invoices for work done on properties owned by either HBK or the Kelleys. PDRA would often even answer its phones as "HBK."[63]

PDRA responds to this point by arguing that Spitters was a sophisticated investor who was aware of (and relied upon) HBK's and PDRA's separate corporate identities, and who therefore had both corporations sign for the note. This argument, while relevant, is not dispositive. The Court has already found that Spitters was not aware of HBK's removal of capital from PDRA via upstreaming, and a finding of inadequate capitalization has been used to support piercing the veil.[64] *See Automotriz del Golfo de California S.A. de C.V. v. Resnick, et al.*, 47 Cal.2d 792, 797, 306 P.2d 1 (1957); 9 Witkin, *Summary*, Corporations § 17 at 529–31.[65]

PDRA's second argument is more compelling. The written decisions of California courts consistently repeat that a finding of alter-ego should only be made when "an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice." *Minifie v. Rowley*, 187 Cal. 481, 487, 202 P. 673 (1921). *See Mesler*, 39 Cal.3d at 300, 702 P.2d 601; *NEC*, 208 Cal.App.3d at 777, 256 Cal.Rptr. 441; *Talbot*, 181 Cal.App.2d at 432, 5 Cal.Rptr. 361. In many of these cases, the veil was pierced so that the creditor/plaintiff could "follow the money,"[66] thus preventing a fraudulent escape of the vulnerable assets. Controlling corporations were made liable for the actions of their subsidiaries. *See* 9 Witkin, *Summary*, Corporations §§ 18–19 at 531–33.

This was the situation in *Las Palmas*, 235 Cal.App.3d 1220, 1 Cal.Rptr.2d 301, where the sellers of a shopping center fraudulently misrepresented to the purchasers that they would guaranty the leases (of floor space in the center) for a certain length of time, as inducement for the purchasers to make the deal. The appellate court upheld an award of approximately $2.5 million in compensatory and punitive damages, and found that 1) as the guarantor was a wholly-owned subsid-

---

**63.** Hagerman did testify that this was done in part to distinguish PDRA from both PDA and Holzman & Daw.

**64.** The question as to whether PDRA had inadequate capital will be decided *infra*.

**65.** The factor of inadequate capitalization is not always determinative on its own. *See Harris v. Curtis*, 8 Cal.App.3d 837, 841, 87 Cal.Rptr. 614 (1970); 18 Am.Jur.2d, *Corporations* § 49 at 851–52 (1985).

**66.** Woodward and Bernstein, *All The President's Men*, Simon & Schuster, New York 1974.

iary, 2) had the same leadership personnel as its owner, and 3) those executives had transferred most of the assets out of the subsidiary guarantor and left it little more than a shell, those damages could also be assessed against the owning company via alter-ego. *Las Palmas,* 1 Cal.Rptr.2d at 310–24.

The *Las Palmas* model would be a close match to the case *sub judice* if it were that HBK had *not* signed the Spitters note, and if it were HBK, not the subordinate PDRA, that represented Spitters' best source for recovery of his $1 million. Under those circumstances, it would not be inequitable to allow Spitters to "follow the money" upstream to HBK. However, solely for purposes of making this argument, Spitters concedes that all $1 million remained with HBK and none of its went to PDRA. The bankruptcy estates of PDRA and HBK have not been substantively consolidated. *See* 5 Collier ¶ 1100.06 at 1100–33 through 1100–47 (15th ed. 1994). To allow Spitters to use alter-ego would be to prejudice the other creditors of PDRA with his $1 million claim if they did not derive reasonably equivalent benefit from his $1 million loan.

Under the actual facts of this case, it was the controlling party, HBK, that immediately took the money from Spitters, and despite its present decrepit condition, HBK is still directly liable on the note (and for its stipulated judgment). Spitters cannot use alter-ego to short circuit the Court's analysis of whether PDRA in fact received the loan funds as reasonably equivalent consideration for its assuming $1 million in liability.

### 5. *Direct Transfer*

■ Both parties spent considerable time at trial disputing the question of how much of the Spitters loan funds were actually transferred onwards to PDRA. PDRA, especially, through the expert testimony of Randall Sugarman, attempted to trace the flow of funds upstream and downstream between HBK and PDRA so as to prove that the Spitters funds were disbursed throughout the HBK financial apparatus, and, if $750,000 of those funds were actually transferred onwards to PDRA (in five $150,000 installments), then they were "siphoned" back upstream shortly afterwards. Spitters mainly responded with testimony from former PDRA employees, such as Delacruz, who testified that the Office Building and Conference Center could not have been completed without the Spitters funds. The parties argued back and forth on the precise dating of the transfers between the two companies, as well as those made to Fugitt for the actual construction work.

■ Tracing of funds has often been a part of fraudulent transfer litigation. *See, e.g., Chase & Sanborn,* 904 F.2d at 593–600. California rules on the tracing of funds are examined in the case of *Kupetz v. United States (In re California Trade Technical Schools, Inc.),* 923 F.2d 641 (9th Cir.1991). *See also Republic Supply Co. of Cal. v. Richfield Oil Co. of Cal.,* 79 F.2d 375 (9th Cir. 1935); *Mitchell v. Dunn,* 211 Cal. 129, 294 P. 386 (1930). However, as evidenced by the dispute at trial between the experts (Ricks and Sugarman) over the proper way to trace the Spitters loan funds under GAAP (generally accepted accounting principles), the Court does not believe that it would be equitable or efficient to trace the path of each individual cash transfer between PDRA and HBK, determining intermediate minimum balances and the like, as opposed to viewing the entire ·transaction between Spitters, HBK and PDRA as a whole. For example, even where each individual piece of a complicated transaction is deliberately structured to avoid violation of fraudulent transfer laws, the overall intent of the parties to deprive creditors of recovery can support a finding of actual fraud. *See Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488, 504 (N.D.Ill.1988).

At trial, the parties presented their positions both on the basis of tracing and on the absolute value of the Office Building. No legal argument was advanced by either party that tracing was the most equitable method of adjudicating the issue of what value was actually transferred to PDRA. Justice in this case is best accomplished by "collapsing the transaction," adding up the sum total of what PDRA gave up and what it gained through the Spitters loan agreement. Courts "typically have had no difficulty in construing such a segmented transaction as

one deal. Courts will not allow the labels that interested parties place on their own transaction to control the rights of third parties." Baird & Jackson, "Fraudulent Conveyance Law," 38 Vand.L.Rev. at 851. To examine the Spitters loan through tracing would leave the Court either with the problem of deciding whether $750,000 *in cash* is reasonably equivalent to a $1 million obligation, or justifying an overbroad punishment of Spitters for Kelley's and HBK's draining PDRA of its liquid assets.

A close analogy to the deal between PDRA, HBK and Spitters can be found in the *Tabor Court* case, 803 F.2d 1288, a part of the infamous *"Gleneagles"* litigation.[67] Institutional Investors Trust ("IIT") loaned money to a colliery and its subsidiaries, the Raymond Group, which quickly turned the funds over to a holding company, Great American, which actually used the funds for the leveraged buyout at issue in the case.[68] Several defendants argued on appeal that the district court had erred in not examining separately the fairness of the consideration that passed between IIT and the Raymond Group. Chief Judge Aldisert, writing for the United States Court of Appeals for the Third Circuit, rejected this argument, noting that the Raymond Group had planned the two transfers in tandem, and treated them as a single financial transaction. *Tabor Court*, 803 F.2d at 1302.

Based on the considerations described above, the Court holds that the complete transaction involving the Spitters loan agreement must be examined in its entirety to determine what consideration was permanently (within the context of this case) given to PDRA in return for its obligation on the Spitters note.

Witnesses for both sides were unanimous in their testimony as to the rough terms of the deal. Spitters would loan $1 million for eight months to finance the construction of the Office Building and the Conference Center. PDRA would then get the use of those facilities. PDRA actually got title to the Office Building (after its completion), for a term of years ending in 2008. PDRA also nominally received HBK's contract rights to use the Conference Center for 100 days/year, rent-free, also until 2008, but PDA did not give its approval to the transfer of the contract rights. These were the same two assets in which Spitters claimed a security interest. The value of PDRA's interest in the assets is the consideration it received for assuming the obligation on the Spitters loan along with HBK. The Court will now evaluate the market worth of these assets, at the time when they were actually transferred to PDRA.

### 6. *How Much Is That Building On The Beach? The One With The Term For Years And The Limited–Use Permit*

■ In measuring the value of physical assets, courts will often search for comparable properties, so as to determine what a "real-world" sale would bring for such an item. That procedure cannot be invoked in this case. PDRA's estate in the Office Building, for example, is restricted both by a use permit that mandates its occupancy by a business involved in the renting of residential property at Pajaro Dunes, and PDA's reversionary interest (PDA will take fee title to the property in 2008). These limitations make it virtually impossible to find a comparable asset.

The parties took different approaches at trial to attempt to prove the value of the Office Building, though both presented expert witnesses. Testifying for PDRA was Randall Sugarman, a CPA who has extensive bankruptcy and court experience and has

---

67. *See Gleneagles I,* 565 F.Supp. 556; *United States v. Gleneagles Investment Co.,* 571 F.Supp. 935 (M.D.Pa.1983) (*"Gleneagles II"*); *United States v. Gleneagles Investment Co.,* 584 F.Supp. 671 (M.D.Pa.1984) (*"Gleneagles III"*); *consolidated and affirmed in part, remanded in part sub nom., Tabor Court,* 803 F.2d 1288; *cert. denied sub nom., McClellan Realty Co. v. United States,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987). *See also Tabor Court,* 888 F.2d 1383 (3rd Cir.1989); *Tabor Court,* 943 F.2d 335 (3rd Cir. 1991), *cert. denied sub nom., Linde v. Carrier Coal Enterprises, Inc.,* —— U.S. ——, 112 S.Ct. 1167, 117 L.Ed.2d 413 (1992); *Tabor Court,* 998 F.2d 1006 (3rd Cir.1993).

68. It is also interesting to note that Great American was 50% owned by one James R. Hoffa, Jr. *See Tabor Court,* 803 F.2d at 1292 n. 1.

often served as a chapter 11 trustee for bankruptcy estates administered by the Court. Sugarman has an MBA from Stanford University, and testified at trial that he had previously been involved in reviewing the financial records of both PDRA and HBK. Although Sugarman has extensive experience relating to real property values, he is not a trained appraiser.

The parties disagreed at trial as to the scope of Sugarman's qualifications as an expert witness. They orally stipulated that Sugarman could testify as an expert about insolvency in general, construction financing, tracing of funds, and the valuation of the Office Building by the income method. The stipulation expressly did not cover whether the income method was the appropriate method of valuation to use in the instant case, nor what was the appropriate capitalization rate to apply to the Office Building. However, the Court found that Sugarman was qualified to testify as an expert in all of the matters currently before the Court, and designated that Spitters' objections to Sugarman's qualifications would be applied to the weight and credibility of his testimony.

Both parties in this case agree that there is not a comparable property to the Office Building for use in an appraisal. Sugarman used the income approach to value the Office Building. Valuation under this method is determined by discounting to present value the stream of income that is attributable to the asset.

Under Sugarman's income approach, the Office Building was valued as the use of a building for eighteen years and not as fee title. He testified that the Office Building was 5,800 square feet as set forth by the building permit. Although the building permit was not entered into evidence, the Court accepts Sugarman's representation in his testimony and as contained in Plaintiff's Exhibit 26, a summary of Sugarman's calculations concerning the value and history of the Office Building.

Sugarman next calculated the rental income on a monthly rent/square foot basis.

For data, he looked to the lease between HBK and Mr. Ted Reed, a former employee of HBK. Sugarman determined that Mr. Reed was paying $2,000 for approximately 2,000 square feet, or $1 per square foot. Sugarman also testified that he corroborated the $1/sq. ft. value with the real estate agency of Mahoney & Tancredi, who also believed the value of such a property in 1989 would have been $1 per foot.[69] It is not clear to the Court how Sugarman determined that Reed's lease was for 2,000 square feet. The lease describes the property in an exhibit, which is simply an illustration of the building and the rooms but contains no measurements. However, the additional support of the third party agency does lend support to the overall $1 per square foot market value determination.

Sugarman did note that the lease was not arm's length, and that there were costs borne by PDRA. Such factors would arguably raise the value of the rent. However, upon receiving the broker's opinion that the market value rent would be $1, Sugarman used the $1 per foot figure.

Based on the $1 per square foot value and the 5,800 total square foot area of the building, Sugarman concluded that the Office Building would produce $5,800 per month in rental income.

Sugarman then determined the discount rate to be 15%. He derived that figure because he believed the property right to use the Office Building, which was less than fee title, had an investment quality equivalent to a junk bond. In April 1990, junk bonds were trading at 15%, and the prime rate was 11.5%. In addition, he believed that as a leasehold, rental income would decline in the last few years because of the known limitation of a lease's duration. Based on this information, Sugarman believed that a 15% discount rate would be generous. The resulting valuation is $432,290, which Sugarman rounded to $450,000.

Sugarman also gave his opinion that the Office Building was a terrible investment for PDRA, because the cost of the building far

---

69. The firm of Mahoney & Tancredi is a major real estate brokerage within the Monterey area. Personnel from the firm have often testified be-

fore the Court. Spitters did not raise a hearsay objection to this reference, as Sugarman was testifying as an expert witness.

exceeded the present value of the rental income stream produced by the building.

Dr. Ralph Bruce Ricks testified for Laurence Spitters. He was awarded a doctorate in real estate and finance from the University of California. He has taught classes in real estate at a variety of institutions including the University of California and Stanford University.

Ricks did not expressly value the Office Building separately from the entire business. However, he did indicate that the value should be determined by looking to the cost of construction. He indicated that *Appraisal of Real Estate* by the American Institute, one of the leading authorities in accounting methods and principles, supports the use of the cost approach where there are no comparable rents or sales in the area, particularly where the asset has a new or special use. He did indicate that this method would be inappropriate where a building is considered to be an overimprovement.

Although Ricks did not testify as to a value for the building, the Defendant's Post Trial Brief indicates that the value attributable to the building is $868,000. Def. Post Trial Brief, p. 75 at line 3. This figure is unsupported by any citation to evidence in the record.

Ricks also criticized the income approach as employed by Sugarman. Ricks first testified that the usable building space was 5,400 square feet, instead of 5,800. The Court notes that if this lower figure is true, it would actually reduce the value of the building as measured under the income approach, something not in the interests of Spitters' case.

Ricks then testified that the total space leased to Reed was closer to 587 square feet than to 2,000. Ricks based his assertion on his "pacing off"[70] the common entry, Reed's reception area, two adjoining sales rooms and a hallway leading to the building's restrooms. On cross-examination, he also indicated that he had included a storage closet in this calculation.

The next substantive objection raised by Ricks was that the lease between PDRA and Reed was not an arm's length transaction, and that therefore the market rent for such office space was actually higher than that being paid by Reed. Ricks testified that part of the consideration flowing to Reed was a two year consulting contract with Kelley valued at $12,000 per year. In addition, Ricks believed that the lease was part of a larger litigation settlement. The Court notes that Sugarman had also indicated that the lease was not negotiated at arm's length, which is why he also surveyed the opinion of a real estate broker in the area, who agreed that the market value was $1/sq. ft. More problematic with respect to the lease is Sugarman's omission of the cost of living adjustment in the lease terms. *See* Exhibit BA, p. 4, § 5.B. The adjustment is based on the Consumer Price Index, and was estimated by Ricks to be approximately 3% per annum.

Finally, with respect to Sugarman's suggested discount rate of 15%, Ricks opined that a 12% interest rate would more accurately reflect the overall risk and maturity of the investment. Important to Ricks' conclusion was his opinion that there was a lesser risk of default with respect to this debt than with junk bonds, the analogy employed by Sugarman.

Neither PDRA nor Spitters had the Office Building appraised. On the basis of the evidence before the Court, the Court finds that Sugarman was the more credible of the two experts on the stand with respect to the value of this particular investment, in part because Sugarman employed the income method in valuing the Office Building. Sugarman was better prepared, and had answers to the questions most crucial to the valuation of the building. Ricks was less well prepared. He had not, for example, researched the interest rates prevailing at the time of the contract.[71] This may constitute less a criticism of Ricks than of Spitters' case on this issue.

---

70. Although it was not clear from his testimony, the Court presumes "pacing off" means that Ricks made a personal examination of the actual Office Building.

71. Ricks also had no opinion as to the value, if any, of PDRA's contractual interest in the Conference Center.

■ Based on the evidence presented, the Court finds that the income method is the preferred method of valuation in this case. Absent a customized asset, where the cost value would likely be most accurate because of the asset's unique application, the cost of an asset is usually not a conclusive indicator of its value. *In re Executive House Associates*, 99 B.R. 266, 278 (Bankr.E.D.Pa. 1989). Therefore, inasmuch as there are no comparables available, and there is only the cost approach and the income approach, the Court relies on the income approach, because the intangible value is inherent in the income stream an asset will generate.

In addition, Ricks testified that the cost approach is not appropriate when the property is an overimprovement. While the Office Building, in terms of extra office space, may not have been an overimprovement for the entire Pajaro Dunes area, it was an overimprovement for PDRA itself, as PDRA did not need to use the entire building.[72] Space rented out to third parties should be measured as an element of future income, as these rentals could accrue to any owner of the Office Building, not just PDRA.

However, the Court does not embrace Mr. Sugarman's valuation without adjustment. Of particular note to the Court are the disputes surrounding the proper rental value of the Office Building and the discount rate that should be applied.

It is clear from the testimony that the Ted Reed lease was not negotiated at arm's length. In addition, it is unclear whether the lease encompasses 587 square feet or 2,000 square feet.[73] But most important, there is a cost of living adjustment in the terms of the lease that requires consideration. Based on the evidence before it, the Court will impose a 3% per annum cost of living increase to be considered in the valuation. In addition, the base rental value of $1 per square foot will be used in valuing the property.

According to Sugarman, a 15% discount rate in 1989 was appropriate for junk bonds in 1989, and a 13% interest rate applied to grade B corporate bonds. Also of note is that the prime rate, the rate charged by banks to their *best* customers, was 11.5%. Sugarman based his 15% rating on the fact that this valuation was not for a fee interest, but only for a term of years, with declining income in the last few years. In contrast, Ricks believed that a 12% rate was more appropriate, given the low risk of default on the building and the medium to long maturity term. The Court finds that a discount rate reflective of both factors is more appropriate. Junk bonds normally have a higher risk factor than the rental income stream of a building, but in this case the risks associated with vacancy, especially during the last few years of the lease, lead the Court to raise the final rate. Therefore, the Court finds that the more appropriate discount rate should be 14%. This rate reflects a risk higher than grade B bonds and lower than junk bonds.

Based on this 14% value, a 3% per annum cost of living increase and a $1 per square foot rental valuation, the Court determines the value of the office building, based on the income approach to be $541,895.55.[74]

### 7. *Value of the Conference Center Rights*

■ PDRA initially argues that it did not receive any value for the use of the Conference Center for 100 days/year rent-free, as these rights belonged to HBK, not PDRA. However, the Court, in treating the entire transaction as a collective transfer, has stat-

---

72. If PDRA actually utilized the entire Office Building directly, this would reinforce Ricks' argument that the cost approach should be used in appraising the building, as a unique asset necessary to PDRA itself and having value for PDRA above its market value.

73. Neither side presented clear evidence on the issue of the physical size of Reed's leasehold. Ricks did not present any specific evidence as to how he had measured the area at 587 sq. ft. Spitters and PDRA each could easily have hired a carpetlayer or carpenter to measure the area

professionally in preparation for trial. In addition, the Court is of the opinion that 587 sq. ft. is rather small for the type of office described by Ricks and depicted in the exhibit to the lease, and that 2000 sq. ft., Sugarman's representation, is more reasonable.

74. The calculation assumes that rent is paid on the first day of each month. Cost of living increases are assessed as of the first of each year, beginning in year two, and continuing throughout the life of PDRA's interest. In addition, the discount period is monthly.

ed in this Decision that the Conference Center rights were the value, along with the Office Building itself, that PDRA received in return for its obligation to Spitters. Accordingly, the value of these rights, discounted for the lack of PDA approval, should be added to that of the Office Building to determine that total value received by PDRA.

Sugarman testified that the value of the contract rights was "0," because PDRA did not own the contract rights. Ricks specifically testified that he had no opinion on the value of the contract rights. No other evidence was submitted on this question during the entire trial.

 The Court has the power to infer specific values for assets and/or damages, but these inferences must be drawn from substantial evidence actually presented by the parties. *GHK Associates v. Mayer Group, Inc., et al.*, 224 Cal.App.3d 856, 873–74, 274 Cal.Rptr. 168, 179 (1990). Where no such substantial evidence is present, the Court cannot find a value.

 PDRA has the burden of showing that it did not receive reasonably equivalent value in return for its assumption of the $1 million liability to Spitters. Part of the value transferred were the Conference Center rights. PDRA's argument that these rights had zero value solely because they allegedly had not been transferred to PDRA is not necessarily dispositive of the matter, but Spitters has not presented *any* evidence as to their real market value to a third party. The Court has no evidentiary basis for determining whether these rights have any substantial market value at all, even though this question might be significant in terms of determining the total value transferred to PDRA. In addition, even though the Court accepts, for purposes of this adversary action alone, that PDRA has a legal claim to the rights (because HBK transferred them to PDRA, and PDA was not supposed to object

unreasonably to such a transfer), the lack of PDA approval for this transfer must at least discount the value of the asset to PDRA, if not obviate it completely.[75] This status is in contrast to that of the Office Building, for which no legal barrier existed to its transfer.

The Court notes that PDRA and PDA have filed complaints and cross-complaints for multiple causes of action against each other, including one under Cal.Civ.Code § 3439.04(b). *See* n. 1.

Accordingly, for purposes of this Decision, the Court finds the value of the Conference Center rights transferred to PDRA to be "0."

### 8. *Search for a Standard*

 Does the $541,895.55 transferred to PDRA constitute reasonably equivalent consideration for its $1 million obligation to Spitters? California case law gives little indication as to what level of remuneration will satisfy the standard. *See, e.g., Barisich v. Lewis*, 226 Cal.App.3d 12, 275 Cal.Rptr. 331 (1990); *Patterson*, 48 Cal.Rptr. 215.

Federal courts of appeal have divided into two main camps. In a seminal decision, the Fifth Circuit has held that, generally, any exchange for less than 70% of market value is not reasonably equivalent. *J.W. Durrett v. Washington National Insurance Co., et al.*, 621 F.2d 201, 203 (5th Cir.1980) ("*Durrett* "). While this 70% rule has been applied stringently in cases, *see, e.g., Willis v. Borg–Warner Acceptance Corp. (In re Willis)*, 48 B.R. 295, 300–01 (S.D.Tex.1985),[76] later decisions of the Fifth Circuit have indicated that the *Durrett* rule is only *dicta*, a guideline not to be applied mechanically. *See Butler Aviation International, Inc. v. Whyte (In the Matter of Fairchild Aircraft Corporation)*, 6 F.3d 1119, 1126 (5th Cir.1993); *Federal Deposit Ins. Corp. v. Blanton*, 918 F.2d 524, 531–32 n. 7 (5th Cir.1990), *reh'g denied*, 923 F.2d 851 (1991).

---

75. Without PDA's prior written approval, the transfer of the Conference Center rights was subject to the risk of PDA legally contesting PDRA's rights. A legal claim to an asset is not the same as actually having possession of that asset. 11 U.S.C. § 542; *John Hancock Mutual Life Insurance Company v. Watson (In re Kincaid)*, 917 F.2d 1162, 1165 (9th Cir.1990).

76. *See also* Gower & West, "The Texas Nonjudicial Foreclosure Process—A Proposal to Reconcile the Procedures Mandated by State Law with the Fraudulent Conveyance Principles of the Bankruptcy Code," 43 Sw.L.J. 1061, 1062 (1990).

In response to *Durrett,* several circuit courts of appeal have explicitly held that determinations of whether value is reasonably equivalent must be based upon a "totality of the circumstances" and an individual examination of the facts of each case. *See Grissom v. Johnson, et al. (In the Matter of Grissom),* 955 F.2d 1440 (11th Cir.1992); *Barrett v. Commonwealth Fed. Sav. and Loan Ass'n,* 939 F.2d 20 (3rd Cir.1991) *("Barrett")* (both sides agreed to use the "totality" test, and the court had no apparent problem with this choice); *Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.),* 914 F.2d 458, 466–67 (4th Cir.1990) (does not reach question of choice of standard, but is sympathetic to "totality" test); *Walker v. Littleton (In re Littleton),* 888 F.2d 90 (11th Cir.1989), *reh'g denied,* 890 F.2d 1167 (1989); *Bundles v. Baker (In the Matter of Bundles),* 856 F.2d 815, 824 (7th Cir.1988) *("Bundles");* *Ozark Restaurant,* 850 F.2d at 344–45.

The Ninth Circuit has generally followed a third course. In *Lawyers Title Insurance Corp. v. Madrid (In re Madrid),* 21 B.R. 424 (9th Cir. BAP 1982) *("Madrid I"),* the Circuit's Bankruptcy Appellate Panel ("BAP") disapproved of the *Durrett* 70% rule, but instead of turning to the "totality" test, the BAP held that the price obtained through a nonjudicial foreclosure sale (properly held without collusion or fraud) was reasonably equivalent value *per se. Madrid I,* 21 B.R. at 427. On appeal, the Ninth Circuit affirmed the judgment, but did so on the separate ground that the foreclosure sale was not a transfer in the first place, and therefore did "not decide whether the amount paid at foreclosure was a reasonably equivalent value." *Madrid v. Lawyers Title Insurance Corp. (In re Madrid),* 725 F.2d 1197 (9th Cir.1984), *cert. denied,* 469 U.S. 833, 105 S.Ct. 125, 83 L.Ed.2d 66 (1984) *("Madrid II").*

Courts of appeal have split over the propriety of the *Madrid I* decision. *Compare In the Matter of Winshall Settlor's Trust,* 758 F.2d 1136, 1138–39 (6th Cir.1985) (foreclosure sale is definitive measure of value) *with First Fed. Sav. & Loan Ass'n of Bismarck v. Hulm (In re Hulm),* 738 F.2d 323 (8th Cir.1984), *cert. denied,* 469 U.S. 990, 105 S.Ct. 398, 83 L.Ed.2d 331 (1984) (foreclosure sale price is at most a rebuttable presumption of value, must have an evidentiary hearing to be conclusive).

In 1992, the Ninth Circuit again took up the *Madrid I* argument, and this time the court also held "that the price received at a noncollusive, regularly conducted foreclosure sale establishes irrebuttably reasonably equivalent value...." *BFP v. Imperial Savings & Loan Association (In re BFP),* 974 F.2d 1144, 1149 (9th Cir.), *aff'd sub nom., BFP v. Resolution Trust Corp.,* —— U.S. ——, 114 S.Ct. 1757, 128 L.Ed.2d 556, *rehearing denied,* —— U.S. ——, 114 S.Ct. 2771, 129 L.Ed.2d 884 (1994) *("BFP").* However, even as the court disagreed with both *Durrett* and *Bundles,* it did not indicate what should be the determination of reasonably equivalent value in the absence of a foreclosure sale. *See BFP,* 974 F.2d at 1148 n. 4, n. 5. In affirming the decision, the Supreme Court did make *dicta* statements that outside of a foreclosure sale, reasonably equivalent value indicates "ordinarily a meaning similar to fair market value." *BFP,* —— U.S. at ——, 114 S.Ct. at 1765. However, neither the majority nor the dissent outlined any benchmarks, such as the *Durrett* rule, as to what that value should normally be. *Id.,* —— U.S. at ——, 114 S.Ct. at 1766.

This Court does not need to choose between the *Durrett* and *Bundles* rules. Under either regime, PDRA's receipt of $541,-895.55 in value in return for its $1 million obligation to Spitters would not be held as reasonably equivalent. Thus, in the Court's analysis, the burden now shifts to Spitters to show that, in May 1989, PDRA was not "engaged ... in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," and that PDRA did not believe nor reasonably should have believed that it "would incur, debts beyond ... [its] ... ability to pay as they became due." Cal.Civ.Code §§ 3439.04(b)(1), 3439.04(b)(2). *See Kirkland v. Risso,* 98 Cal.App.3d 971, 159 Cal.Rptr. 798 (1979); *Neumeyer v. Crown Funding Corp.,* 56 Cal.App.3d 178, 128 Cal.Rptr. 366 (1976).

### E. UNREASONABLY SMALL ASSETS

■ In determining whether the Spitters note fails either test, *i.e.*, the "unreasonably small assets" ("USA") test or the "debts beyond reasonable ability to repay" ("reasonable ability") test, the Court must re-create the financial condition of PDRA at the time when the transfer took place. This process is called "retrojection." *See, e.g., Misty Management Corp. v. Lockwood,* 539 F.2d 1205, 1213 (9th Cir.1976) ("*Misty Management*"); *Fitzgerald v. Cheverie (In re Edward Harvey Co., Inc.),* 68 B.R. 851, 857 (Bankr.D.Mass.1987).

There is no definition of the USA test in the Code. *Yoder v. T.E.L. Leasing, Inc., et al. (In re Suburban Motor Freight, Inc.),* 124 B.R. 984, 998 (Bankr.S.D.Ohio 1990) ("*Suburban Motor Freight*"). Courts have split on the proper application of the test, with some holding that insolvent debtors have inadequate capital *per se.*[77] *See, e.g., Gleneagles I,* 565 F.Supp. at 556; *Louisiana Indus. Coatings, Inc. v. Pertuit (In re Louisiana Indus. Coatings, Inc.),* 31 B.R. 688, 698 (Bankr. E.D.La.1983); *Spanier v. U.S. Fidelity & Guar. Co.,* 127 Ariz. 589, 623 P.2d 19, 24 (Ariz.App.1980). At least one court has held that the USA test is triggered even when the debtor is solvent, but the transfer has placed in motion "difficulties" that have already led, or will likely lead to insolvency. *Vadnais Lumber,* 100 B.R. at 128.[78]

Other decisions use language supporting a more relativistic, case-by-case approach. *See Barrett v. Continental Illinois Nat'l Bank & Trust Co.,* 882 F.2d 1, 4 (1st Cir.), *cert. denied,* 494 U.S. 1028, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990) ("*Barrett*"); *Credit Managers,* 629 F.Supp. 175; *Wells Fargo Bank v. Desert View Bldg. Supplies, Inc. (In the Matter of Desert View Building Supplies, Inc.),* 475 F.Supp. 693 (D.Nev.1978), *aff'd mem.,* 633 F.2d 225 (9th Cir.1980). Under this approach, the court should weigh the raw financial data of the balance sheet against the nature of the entity and its need for capital over time. *Barrett,* 882 F.2d at 4; *Kepler v. Atkinson (In the Matter of Atkinson),* 63 B.R. 266, 269 (Bankr.W.D.Wis.1986).

■ A third approach to the USA test can yet·be discerned, partially even from within some of the above-mentioned cases. This method focuses on the debtor's future ability to generate cash and pay its debts as they come due. *See Moody v. Security Pacific Business Credit, Inc.,* 971 F.2d 1056, 1073 (3rd Cir.1992) ("*Moody*"); *Suburban Motor Freight,* 124 B.R. at 999; *Vadnais Lumber,* 100 B.R. at 137; Queenan, "The Collapsed Leveraged Buyout and the Trustee in Bankruptcy", 11 Cardozo L.Rev. 1 (1989). However, this analysis tends to blur the lines between the USA and "reasonable ability" tests. *Compare Moody* 971 F.2d at 1073 *with Moody,* 971 F.2d at 1067; *Credit Managers,* 629 F.Supp. at 183–87. The tests can be distinguished through the use of the balance sheet approach in the USA analysis, while "reasonable ability" requires the valuation of assets as part of an ongoing concern. *Moody,* 971 F.2d at 1067; *In the Matter of Taxman Clothing Co., Inc.,* 905 F.2d 166, 169–70 (7th Cir.1990) ("*Taxman*").

Sugarman's valuation of PDRA as a *going concern* is based on the evaluation of PDRA's balance sheet as of April 30, 1989, the day the Spitters note was executed. Sugarman's analysis starts out with an equity figure of $591,645. From this, he calculates certain adjustments. The Court will now review both those adjustments and Ricks' criticisms of Sugarman's approach.

#### 1. Accounts Receivable from HBK

■ Sugarman's first adjustment was to write off the accounts receivable owed to PDRA from HBK. This entry was for $376,-323. Sugarman states that this write-off from the asset side of PDRA's balance sheet

---

**77.** Insolvency is defined in the Bankruptcy Code as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property ..." 11 U.S.C. § 101(32)(A). This is a "balance-sheet" test. *Akers v. Koubourlis (In re Koubourlis),* 869 F.2d 1319, 1321 (9th Cir.1989); *Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.),* 96 B.R. 275, 277 (Bankr. 9th Cir.1989).

**78.** For a criticism of the *per se* rule, *see* Markell, "Toward True and Plain Dealing: A Theory of Fraudulent Transfer Involving Unreasonably Small Capital," 21 Ind.L.Rev. 469 (1988).

is necessary because of HBK's insolvency at the time the note was executed. He also testified at trial that his prior analysis of HBK indicated that HBK was already insolvent by $12 or $13 million at the time. Therefore, HBK had no way of making payments on the accounts receivable.

Ricks did not testify regarding HBK's general financial status as the time of the Spitters loan. Rather, he testified in response that, according to Sugarman's own analysis (Exhibit 34), HBK had actually reduced the nominal level of its debt to PDRA between the time of the Spitters loan and Pelican's takeover of the stock. However, the Court notes that this decrease was solely due to the transfer of the Spitters funds, over which HBK still had exclusive control in terms of construction disbursements. The Court has already determined that it will examine this transaction in terms of the $1 million in cash remaining in HBK's hands, with the actual Office Building and Conference Center use rights being the value transferred to PDRA. Accordingly, based on the evidence presented, the Court finds that HBK was incapable of repaying its debt to PDRA, and the value of that debt to PDRA should properly be considered as "0" in line with Sugarman's analysis, not the $376,323 nominally owed by HBK.

### 2. Conference Center Cost to PDRA

The next two adjustments involve the write off of the cost of the Conference Center that was paid by PDRA (through the transferred Spitters funds) and for the cost of rental operations that were paid by PDRA on behalf of HBK. These entries are $51,191 and $39,642, respectively, and were separately calculated from the other debts owed by HBK to PDRA.

Sugarman's rationale for taking these write-offs is the same as that for the other accounts receivable from HBK: HBK was insolvent and therefore had no way of making these payments. The Court's judgment is therefore also the same, that HBK could not reasonably repay these debts, and they were properly written off.

### 3. Other Receivables

This adjustment, deducting $59,336, covered receivables of PDRA that had been already been determined to be irrecoverable as of May 1, 1989. Sugarman indicated this write off was pursuant to both his analysis of PDRA's escrow account and Maggio's deposition testimony. No contrary evidence was presented against this alteration, and so the Court accepts Sugarman's deletion of the entry for $59,336.

### 4. Bonus to Maggio

Maggio filed a claim in PDRA's bankruptcy estate for a total of $4,737.28 in unpaid wages and vacation pay, and $166,000 in incentive bonuses. PDRA did not object to the wages and vacation pay, but filed an objection to the bonuses. This claim has been settled (after the conclusion of the Spitters trial) in the amount of $51,850, plus the accepted $4,700+ in unpaid wages.

Some of Maggio's claimed bonuses were accrued before May 1, 1989. However, at least several months of these bonuses, calculated by Sugarman in the amount of $30,300, had not been recorded as liabilities of PDRA as of that date. Sugarman, noting that PDRA was contesting Maggio's entire bonus claim, nevertheless added this liability to his calculations, with the stated caveat that if the objection to claim was successful, the $30,300 liability could be removed and the estate's total worth increased accordingly.

Maggio's claim was settled for $51,850, 31.235% of its initial amount. This settlement did not define whether Maggio was entitled to bonuses for only certain periods of time. Accordingly, the Court will apply the overall 31.235% to the disputed debit of $30,300, to arrive at a correct deduction of $9,464.21.

### 5. Accounts Receivable from Seminars and Vacations

Sugarman wrote off accounts receivable of PDRA as of April 1989 that were ultimately written off in December 1989. These accounts totalled $134,235. Sugarman explained that these accounts showed no activity from April to December, and that this fact

coupled with their eventual write off in December justified treating them as valueless in April. In the absence of evidence to the contrary, the Court will accept this analysis, and hold that Sugarman's adjustment was proper.

### 6. *Property Not Held in Title*

The final adjustment made to the balance sheet was to eliminate the entries of $90,310 in assets whose legal title was not held by PDRA as of April 30, 1989, specifically, House 143 and Cypress 8–9–10. Sugarman noted that the asset values of properties not held in title by PDRA should not be included as assets because they could be taken without compensation to PDRA.

Ricks testified that PDRA should be charged with some value for the use of the properties as part of their conference business. However, he did not present any evidence as to what that value should be. Ricks also objected to the book values, arguing that he had seen an appraisal of House 143 setting its value at $500,000, and an appraisal of Cypress 8–9–10 setting its value at $1,319,000. However, these appraisals were not admitted into evidence, and the Court notes that Ricks is not a qualified appraiser in his own right.

The Court is aware that the legal status of Cypress 8–9–10 is a matter of dispute in another adversary action filed by PDRA.[79] However, as of May 1, 1989, PDRA did not have legal title to the properties, and no evidence has been presented in this action to quantify any equitable interest that PDRA may have had at the time. Accordingly, Sugarman was correct in deleting this line item as part of his analysis of PDRA's books.

### 7. *The Net Result Before the Office Building*

Sugarman concludes that the $781,337 in adjustments deducted from the $591,645 in equity results in a net loss of $189,692 as of May 1, 1989. The Court has adjusted Sugarman's figures in only one aspect, that the Maggio claim should be counted as only

$9,464.21, not $30,300. Accordingly, PDRA's net loss should be calculated as $168,856.21.

### 8. *The Office Building*

As discussed above, the Court has found that the Office Building has a value of $541,895.55. The value of the building as listed on the balance sheet is $172,208. Therefore, the proper adjustment on the balance sheet is an increase of $369,687.55.

### 9. *Liquidation Analysis Total*

For purposes of the USA test, the debtor is analyzed on a liquidation basis, without intangibles or goodwill values. *Gleneagles I*, 565 F.Supp. at 556. Accordingly, PDRA's net worth as of May 1, 1989 equaled $541,895.55 (Office Building) less $168,856.21 (Net Loss) less $1,000,000 (Spitters loan) for a total negative value of − $626,960.66. PDRA thus fails to pass the USA test.

### F. *REASONABLE ABILITY*

If a transfer was not made for reasonably equivalent value, even if it passes the USA test, the transferee must still demonstrate that the debtor "intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." Cal.Civ.Code § 3439.04(b)(2). This test measures whether the debtor, as a going concern, would reasonably have been seen as able to pay its debts after making the questionable transfer. *Moody*, 971 F.2d at 1067; *Taxman*, 905 F.2d at 169–70.

"Reasonableness" is often measured through the use of cash flow projections and other forward-looking sources of evidence available to the debtor and its creditors at the time of the transfer. If these sources were flawed and overly optimistic from the beginning, then they were unreasonable. However, if they were improvident only in the light of intervening circumstances such as fire, then the "reasonable ability" test has not been violated. *See Telefest*, 591 F.Supp. at 1373; *Ohio Corrugating I*, 70 B.R. at 927–28.

79. *See PDRA v. HBK California Mortgage Fund,* Adv. # 93–5261.

The key debt which PDRA had to be able to pay as it came due was the Spitters note itself. Sugarman testified that while PDRA's cash flow might have been able to handle the $1 million obligation on a long-term, amortized basis, the debtor would not have been, and in fact was not able to repay the loan just eight months, or even eleven months, after the delivery of the initial installment of the principal.

The Court finds this testimony to be credible. No evidence was presented to demonstrate that PDRA, in May 1989, had a reasonable belief in its ability to repay the Spitters loan at the end of its original eight month term. Kelley testified that he had hoped to be able to refinance the Office Building once it was completed, or to sell other property to repay Spitters. No evidence was presented to show that a bank or other financing source actually presented Kelley with an offer to refinance the Office Building. The Court notes that it is undisputed that PDRA was not actually able to refinance the Office Building once it was completed, and that its actual value is less than $550,000, far from enough to secure a $1 million refinancing loan.

To complete its analysis of the "reasonable ability" test, the Court will examine the net worth of PDRA in May 1989 as a going concern.

### 1. *Value of Intangible Assets*

Included in the value of a business as a going concern, above and beyond the simple book value of the tangible assets, is the value of the intangible assets. In this case, Sugarman calculates this intangible asset value based on a capitalization rate of the income in excess of the industry standard return on assets.

To calculate the return on assets of PDRA, Sugarman takes the net cash flow *before interest, taxes and depreciation*, which he calculates to be $192,958. However, as pointed out by Ricks, the correct cash flow figure, according to the "Real Estate Lessors" entry in the *Almanac of Business and Industrial Financial Ratios* is net cash flow *before taxes and interest only*. Therefore, while the correct initial cash flow figure before taxes

and interest is $192,958, when depreciation (as entered in PDRA's books) in the amount of $106,619 is included, it produces a total of $299,577.

Sugarman next calculates an estimated Office Building loan payment schedule that PDRA would have to pay if it were able to refinance the Office Building. Sugarman accomplishes this by amortizing the value of the Office Building over 216 monthly periods at 12%. The Court notes that the Office Building has been valued at $541,895.55, which, amortized using the given figures, produces a monthly payment of $6,133.99, or $73,607 per year. Subtracting this cash cost from the net cash flow produces a $225,-969.12 net cash flow after payment of the Office Building.

Sugarman's next adjustment is to eliminate the negative cash flow attributable to the payments on Cypress 8–9–10 and House 143 made by PDRA, based on the argument that PDRA did not have legal title to these properties at the time. This adjustment would add $22,149 to the net cash flow figure, producing a net income before taxes of $248,-118.12.

The next calculation requires the determination of the return on assets based on the *Almanac of Business and Industrial Financial Ratios*. This is determined by multiplying the value of the total tangible assets by the return on assets as set forth in the *Almanac*. The total tangible assets of PDRA is the sum of the value of the Office Building, $541,895.55, plus all other assets, $561,543, to produce a physical asset value of $1,103,348.55. Multiplied by the 10.3% return on asset ratio, PDRA's return on assets is calculated as $113,644.90.

When the return on assets is compared to the actual net income before taxes of PDRA, the surplus is considered to be the income attributable to the intangible assets. This comparison of $113,644.90 to $248,118.12 produces a surplus of $134,473.22.

Sugarman testified that the capitalization rate to use on this figure would be 20%. Essentially, this translates to multiplying the surplus amount by a factor of five, to produce an intangible asset value of $672,366.10.

Spitters did not present any contrary evidence on this issue.

### 2. Final Valuation of the Business

The final valuation requires the Court to add up the value of the individual assets and to deduct the sum of the individual liabilities.

The Court first adds the balance sheet equity figure of $591,645 to the intangible asset value of $672,366.10. Next, the $369,687.55 adjustment to the value of the building must also be included. The calculation produces a total asset value of $1,633,698.65.

The Court next subtracts the Spitters $1,000,000 loan, to reach $633,698.65. From this, the Court then deducts the adjustments as approved in the discussion of the USA test: $376,323 in accounts receivable from HBK, $51,191 for payments made by PDRA on behalf of HBK on the conference center, $39,642 for the rental unit receivables, $59,336 for the leaseback receivables, $9,464.21 for the accumulated bonus to Maggio, $134,235 for seminars and vacations, and $90,310 for the non-ownership of Cypress 8–9–10 and House 143. These adjustments total $760,501.21, and produce a *total negative net value of −$126,802.56.*

### G. CONCLUSION ON FRAUDULENT TRANSFER CAUSE OF ACTION

Because PDRA did not receive reasonably equivalent value in return for its assuming liability for the Spitters note, and because at the time PDRA's assets were unreasonably small in relation its increasing obligations, and because through the assumption of liability PDRA incurred debts that it reasonably should have believed that it could not pay as they became due, the note was a fraudulent transfer in violation of Cal.Civ.Code § 3439.04(b) and 11 U.S.C. § 544(b).

### H. REMEDY

#### 1. "Moore'd" Principles

Fraudulent conveyance laws, including Cal. Civ.Code §§ 3439 et seq., do not clearly set out who bears the burden of recovery from improper transfers. "Section 548 … gives no indication, expressed or implied, of where ultimate financial liability for wrongful transfers should lie." *Wieboldt Stores, Inc. v. Schottenstein,* 111 B.R. 162, 167 (N.D.Ill. 1990).

Several rules can be gleaned from the case law. First, even intentionally fraudulent transfers are valid between the participants, who are presumed to act *in pari delicto. See Patterson,* 48 Cal.Rptr. 215; *Hyde Properties v. McCoy,* 507 F.2d 301, 305 (6th Cir.1974); *Sharrer v. Sandlas,* 103 A.D.2d 873, 477 N.Y.S.2d 897 (App.Div.1984), *appeal denied,* 63 N.Y.2d 610, 473 N.E.2d 1190, 484 N.Y.S.2d 1024 (1984), *reh'g denied,* 64 N.Y.2d 885, 476 N.E.2d 1008, 487 N.Y.S.2d 1029 (1985); *Blaine v. Krysowaty,* 135 N.J.Eq. 355, 38 A.2d 859 (N.J. Ch. 1944) (*"Blaine"*). "He who attempts to cheat others by a fraudulent transfer of his property, will not be heard to complain if in the endeavor he is cheated himself. There is a rugged but wholesome justice in compelling him to take what he has tried to give." *Blaine,* 135 N.J.Eq. at 356, 38 A.2d at 860.

Second, the transfer will be avoided only as far as necessary to protect the claims of other creditors, and the surplus should remain in the hands of the transferee. Cal. Civ.Code § 3439.07(a)(1); *In re Camm's Estate,* 76 Cal.App.2d 104, 172 P.2d 547 (1946); 16 Cal.Jur. (3rd ed.), Creditor's Rights and Remedies § 453 at 565–66 (1983).

The state law remedies listed in Cal. Civ.Code § 3439.07 are not easily applicable to the case at bar, as they generally deal with the recovery of a physical asset transferred away from the debtor, not the avoidance of an obligation. *See* 12 West's Ann.Cal.Codes at 158–160 (Supp.1994). The most important single judicial decision on the question of how broad is the power to avoid fraudulent transfers under federal bankruptcy jurisdiction was *Moore v. Bay (In re Estate of Sassard & Kimball, Inc.),* 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931) (*"Moore"*). This short opinion (one of the last by Justice Holmes [80])

---

[80]. *United States v. Kirby Lumber Co.,* 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131 (1931) was released on November 2, 1931, the same day as *Moore v.* *Bay.* Justice Holmes subsequently authored the Supreme Court's decisions in *State Tax Commission of Mississippi v. Interstate Natural Gas Co.,*

contains two holdings; 1) that any property recovered by the trustee comes back into the estate for the benefit of all of the unsecured creditors, not just those named as plaintiffs in the action, and 2) improper transfers may be avoided in their entirety, regardless of the relationship between the size of the transfer and the amount of the unsecured claims. *Vadnais Lumber*, 100 B.R. at 134; *Collier* ¶ 548.03 at 548–54. While the second holding has been criticized, *see* Jackson, "Avoiding Powers in Bankruptcy," 36 Stan.L.Rev. 725, 742–50 (1984), it is still good law. *See, e.g., Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800 (9th Cir.1994) ("*Acequia* "); *Pate v. Hunt (In re Hunt)*, 136 B.R. 437, 451 (Bankr.N.D.Tex.1991); *Anderson Industries, Inc. v. Anderson, et al. (In re Anderson Industries, Inc.)*, 55 B.R. 922, 926 (Bankr. W.D.Mich.1985); McCoid, "Moore v. Bay: An Exercise In Choice Of Law," 1990 Ann. Surv.Bankr.L. 157 (1991).

A subsidiary effect of *Moore* is that it obviates state law defenses that could bar recovery by many creditors outside of bankruptcy. *See DeWest Realty Corp. v. IRS*, 418 F.Supp. 1274, 1279 (S.D.N.Y.1976); *Haskins v. Certified Escrow & Mortgage Co.*, 96 Cal.App.2d 688, 216 P.2d 90 (1950). This result is not unique to fraudulent transfer actions. *See Canada So. R. Co. v. Gebhard*, 109 U.S. 527, 3 S.Ct. 363, 27 L.Ed. 1020 (1883).[81]

### 2. *Good Faith Recovery*

▪ In both state and federal fraudulent transfer law, a transferee who acted in good faith is protected from the avoidance of the transfer to the extent of the value that he actually provided to the debtor. *See* Cal.Civ. Code § 3439.08; 11 U.S.C. § 548(c). The Court has already found both that Spitters

acted in good faith, and that he provided $541,895.55 in actual value to PDRA. Accordingly, Spitters enjoys an unsecured claim for $541,895.55 in PDRA's bankruptcy estate, equal in priority to all other general unsecured claims. Cal.Civ.Code § 3439.08(d)(2).

Some older case law could be interpreted to read that a transferee who acted in good faith should receive an unsecured claim for the full amount that the transferee actually surrendered. *See Misty Management*, 539 F.2d at 1214–15. However, this interpretation only directly applies when all of that payment by the transferee was actually made to the debtor. *In re Hough*, 4 B.R. 217, 219 (S.D.Cal.1980). The statute clearly reads that it is the amount received by the debtor that establishes the good faith claim. Cal. Civ.Code § 3439.08.

### 3. *Treatment of the Remainder*

▪ After subtracting the good faith claim for which consideration was actually transferred to PDRA, the Court is left with determining the disposition of the remainder of Spitters' claim against the estate, some $458,104.45. The harshest remedy available would be to invalidate it, a solution usually reserved for cases of actual fraud. *See, e.g., Roco*, 701 F.2d at 981–84; *Browning v. Williams (In re Silver Wheel Freightlines, Inc.)*, 64 B.R. 563, 566–68 (Bankr.D.Or.1986); *Pirrone v. Toboroff (In re Vaniman International, Inc.)*, 22 B.R. 166, 181–85 (Bankr. E.D.N.Y.1982). Obligations have also been invalidated in situations involving inter-corporate guaranties, where the junior company (debtor) guaranteed a debt for which all or almost all of the proceeds went to the senior entity. *See Ear, Nose and Throat Surgeons of Worcester, Inc. v. Guaranty Bank and Trust Co. (In re Ear, Nose and Throat Sur-*

---

284 U.S. 41, 52 S.Ct. 62, 76 L.Ed. 156 (1931) on November 23, *United States ex rel. Polymeris v. Trudell*, 284 U.S. 279, 52 S.Ct. 143, 76 L.Ed. 291 (1932) on January 4, and *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932) on January 11. Justice Holmes resigned on January 12, 1932, and Justice Benjamin Cardozo was appointed on March 2, 1932.

**81.** "Bankrupt laws have been in force in England for more than three centuries, and they had their origin in the Roman law. The Constitution

expressly empowers the Congress of the United States to establish such laws. Every member of a political community must necessarily part with . some of his rights which, as an individual, not affected by his relation to others, he might have retained. Such concessions make up the consideration he gives for the obligation of the body politic to protect him in life, liberty and property. Bankrupt laws, whatever may be the form they assume, are of that character." *Canada So. R. Co. v. Gebhard*, 109 U.S. at 536, 3 S.Ct. at 369.

geons of Worcester, Inc.), 49 B.R. 316 (Bankr.D.Mass.1985); Lawless v. Eastern Milk Producers Cooperative Association, Inc. (In re Stop–N–Go of Elmira, Inc.), 30 B.R. 721 (Bankr.W.D.N.Y.1983). That fact pattern is similar to the one presently before the Court, in that PDRA is left liable for a loan that benefitted (at least in part) HBK.

However, other considerations mitigate the negative consequences that Spitters should bear for being the transferee in this fraudulent conveyance. In contrast to many of the cases listed above where the creditor's claims were invalidated, no actual fraud has been pled in this instance, and the Court has specifically found that Spitters acted in good faith. In addition, aside from the Spitters loan, PDRA does not have an overwhelming level of creditor claims as opposed to its unencumbered assets, especially in a reorganization context.[82] Finally, Spitters in good faith parted with $1 million, and PDRA's estate is his sole realistic source of recovery. In light of the rule that fraudulent transfers are binding between the parties, Patterson, 48 Cal.Rptr. 215, the Court determines that the remainder of Spitters' claim should be equitably subordinated to the claims of all other unsecured creditors of the estate.

### 4. Equitable Subordination

■■■■ The power of equitable subordination, 11 U.S.C. § 510, can be used by bankruptcy courts to punish creditors for their bad conduct by denying them recovery until other creditors have been paid, though an admitted claim cannot be subordinated to ownership interests. Badger Freightways, Inc. v. Continental Illinois National Bank and Trust Co. of Chicago (In re Badger Freightways, Inc.), 106 B.R. 971, 980 (Bankr. N.D.Ill.1989); University Drive Professional Complex, Inc. v. Federal Savings and Loan Insurance Corporation (In re University Drive Professional Complex, Inc.), 101 B.R. 790, 799 (Bankr.S.D.Fla.1989). The general rule is that "a claim will not be subordinated unless it is shown that the claimant has acted inequitably in the course of his relationship with the debtor and that those actions have harmed the debtor or his other creditors in some way." Trone v. Smith (In re Westgate–California Corp.), 642 F.2d 1174, 1178 (9th Cir.1981) ("Westgate"), citing Stebbins v. Crocker Citizens National Bank (In re Ahlswede), 516 F.2d 784, 788 (9th Cir.1975), cert. denied, 423 U.S. 913, 96 S.Ct. 218, 46 L.Ed.2d 142 (1975). Undercapitalization can be included within the scope of inequitable action. See Summit Coffee Company, et al. v. Herby's Foods, Inc. (In the Matter of Herby's Foods, Inc.), 2 F.3d 128, 131–32 (5th Cir.1993); Blasbalg v. Tarro (In re Hyperion Enterprises, Inc.), 158 B.R. 555, 560–61 (D.R.I.1993) (both relying on Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.), 926 F.2d 1458 (5th Cir. 1991)).

■■■ Some courts reserve equitable subordination in fraudulent transfer actions to parties who were either in control of the debtor and/or committed actual fraud. Compare In the Matter of Process–Manz Press, Inc., 236 F.Supp. 333 (N.D.Ill.1964), reversed on other grounds, 369 F.2d 513 (7th Cir. 1966), cert. denied sub nom., Limperis v. A.J. Armstrong Co., Inc., 386 U.S. 957, 87 S.Ct. 1022, 18 L.Ed.2d 104 (1967) with Rosania v. Haligas et al. (In re Dry Wall Supply, Inc.), 111 B.R. 933 (D.Colo.1990). However, the modern trend is to subordinate fraudulent claims in other circumstances as well, Tabor Court, 803 F.2d at 1301; In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 288 (Bankr.S.D.N.Y.1990), even when the transferee committed no intentionally bad acts. See In re SPM Manufacturing Corporation, 163 B.R. 411 (Bankr.D.Mass. 1994); Murphy v. Meritor Savings Bank (In re O'Day Corporation), 126 B.R. 370, 412 (Bankr.D.Mass.1991).

The United States Court of Appeals for the Fifth Circuit has applied equitable subordination as a remedy for fraudulent transfers after checking whether any other remedy existed at law under the facts of the particular case. Wilson v. Huffman (In the Matter of Missionary Baptist Foundation of Amer-

---

**82.** This is not a formal finding for purposes of any future hearing, inter alia, on a plan of reorganization for PDRA.

*ica, et al.)*, 818 F.2d 1135, 1147 (5th Cir. 1987). No other such remedies are available to PDRA (with regard to the $1 million in principal owed to Spitters under the note). Finally, the Court does have broad powers to craft an appropriate remedy, both under this statute and in general. *See* 11 U.S.C. § 105(a); Cal.Civ.Code § 3439.07(a)(3)(C).

The Court holds that all of Spitters' claim for which he did not give consideration to PDRA in good faith, some $458,104.45, is subordinated to the claims of all other unsecured creditors, the class which was injured by the fraudulent transfer. Other classes of creditors were not so injured, and cannot benefit from the subordination. *Estes v. N & D Properties, Inc. (In re N & D Properties, Inc.)*, 799 F.2d 726, 732–33 (11th Cir.1986).

Together with the resolution of Spitters' good faith claim for value given, Cal.Civ.Code § 3439.08, this provides a fair resolution to the dispute over the $1 million loan, at least as far as PDRA and Spitters are concerned. Spitters will share *pro rata* with all other unsecured creditors to the extent that he actually gave value to PDRA, in the amount of $541,895.55. The remainder of his claim is somewhat tarnished in character by the actions of Kelley and HBK, and is thus subordinated to the claims of all other unsecured creditors, but as Spitters generally was an innocent victim of their machinations, it is not eradicated. The unsecured creditors are thus protected from the effects of the transfer, while Spitters can still enforce his claim between the parties themselves.

### 5. *Final Considerations*

If PDRA were now in Chapter 7, this might be the end of the fraudulent transfer issue. Approximately half of Spitters claim would be treated as part of the general unsecured creditor pool, and half would be subordinated, effectively invalidated unless large amounts of assets were available to pay claims. However, the present bankruptcy is actually in Chapter 11, and this raises two final issues.

First, as noted *supra*, the primary goal of a fraudulent transfer action is to protect the unsecured creditors. *Ohio Corrugating I*, 70 B.R. at 927. Unless a Chapter 7 liquidation would provide more relief for the creditors, most of these claims will be repaid through a Chapter 11 plan. 11 U.S.C. 1129(a)(7)(A)(ii). But what if large amounts of subordinated debt from a fraudulent transfer prevented a debtor from successfully confirming such a plan? In that case, would it be more equitable to invalidate as much of the subordinated debt as is necessary to preserve the best chance of recovery for the unsecured creditors? No evidence was presented on this question at trial. This question is not before the Court.

■ Second, the law is clear that equitable subordination should not be employed as an additional penalty when other remedies have cured the wrong. "Moreover, where the claimant has provided full restitution or adequate assurances thereof, subordination of his claims will operate only to punish his wrongdoing and therefore will be inappropriate." *Westgate*, 642 F.2d at 1178. If Spitters were to guaranty the full payment of all allowed unsecured claims against PDRA, such as by posting a bond for that amount, the equitable subordination of part of his claim would become a moot issue, as the estate would not have been injured. However, as of this date, Spitters has not offered such a guaranty.[83]

### I. *PREFERENTIAL OR AVOIDABLE INTEREST?*

Throughout the fraudulent transfer morass of this case, the parties have almost forgotten that the present complaint includes an action to recover preferential transfers, 11 U.S.C. § 547, and also avoid them as fraudulent, 11 U.S.C. ·§ 548. Specifically, PDRA wants Spitters to return some $43,095.89, paid to him in four interest payments on the note within one year of PDRA's bankruptcy petition.

---

**83.** Such a bond would only be applicable in a case, such as the one at bar, where the fraudulent obligation was merely subordinated instead of voided in its entirety. If a transfer is entirely avoidable under 11 U.S.C. §§ 544(b) or 548, the estate is entitled to recover funds beyond those necessary to pay all of its unsecured debts. *Acequia*, 34 F.3d 800.

### 1. Fraudulent Interest Payments

 The parties have not discussed, either in their pleadings or at trial, any case law or academic analysis of the proper treatment of interest payments made on an obligation later held to be a constructively fraudulent transfer. PDRA argues that the interest payments made within one year of its bankruptcy petition should be avoided as fraudulent transfers in their own right under 11 U.S.C. § 548, but does not provide any support for this position. Spitters merely repeats that the entire transaction was not a fraudulent transfer, a position already rejected by this Court.

As part of its duty to craft an appropriate remedy, the Court notes that it has already found, *supra*, that in return for the $1 million obligation, Spitters furnished PDRA $541,-895.55 in value. This equates to a value-to-debt ratio of 54.18955%. Applying this ratio to the interest payments reveals that $19,-742.42 was paid as interest on the fraudulent portion of the obligation, and $23,353.47 on the portion for which value was given. However, this calculation does not in itself determine whether this amount, or the entire $43,-095.89, or any amount should be returned by Spitters to PDRA, and what rights to those funds would be retained by Spitters in such an event.

The Court finds an attractive analogy to the present situation in contract law. Normally, parties are entitled to the benefits for which they contracted. However, when such a contract is declared void by an appropriate court, the aggrieved party may still seek relief under the doctrine of *quantum meruit*, fair payment for benefit conferred, a quasi-contractual recovery designed to prevent unjust enrichment of the receiving party. Witkin, *Summary*, Contracts §§ 91–118 at 122–144. *Quantum meruit* recovery does not necessarily reward a party with all that it had expected under the contract, but it represents a fair resolution of an unfortunate situation.

Applying *quantum meruit* principles to the situation at bar, the Court holds that Spitters should return to PDRA the $19,-742.42 that he was paid as interest on the portion of his note which was not exchanged for value. This amount will be added to the $458,104.45 in unsecured debt subordinated to the claims of all other unsecured creditors.

### 2. Preferential Interest Payments

PDRA also contends that the $43,095.89 in interest paid on the Spitters note within one year of its bankruptcy petition were preferential transfers in violation of 11 U.S.C. § 547. As $19,742.42 has already been ordered returned to PDRA as a consequence of the fraudulent transfer, this preference action only affects the remaining $23,353.47 of the interest payments.

Spitters does not contest that the interest payments were made in violation of the language of the Code; specifically, that they were to or for the benefit of a creditor, for an antecedent debt owed by the debtor before the transfer, made while the debtor was insolvent, made on or within one year of the filing of the petition if such creditor was an insider, and enabled the creditor to receive more than it would have in a Chapter 7 liquidation. *Mordy v. Chemcarb, Inc. (In re Food Catering & Housing, Inc.)*, 971 F.2d 396, 397 (9th Cir.1992) (*"Food Catering"*). Spitters does raise two affirmative defenses to the action, neither of which are sufficient to deny judgment for PDRA.

 In the case of *Levit v. Ingersoll Rand Financial Corp. (In re V.N. Deprizio Constr. Co.)*, 874 F.2d 1186 (7th Cir.1989) (*"Deprizio"*), the United States Court of Appeals for the Seventh Circuit held that 11 U.S.C. § 547(b)(4)(B), which extends the preference time period to one year for payments made to insider creditors, covered payments made to non-insiders when an insider had guaranteed that debt. Spitters argues that the *Deprizio* rule is not binding on this Court. However, since the conclusion of trial, the United States Court of Appeals for the Ninth Circuit has decided the case of *Official Unsecured Creditors Committee of Sufolla, Inc. v. U.S. National Bank of Oregon (In re Sufolla, Inc.)*, 2 F.3d 977 (9th Cir.1993), in which it held that *Deprizio* was the proper interpretation of section 547(b)(4)(B). As HBK and the Kelleys were co-makers and guarantors, respectively, of

the Spitters note, PDRA's interest payments benefitted these insiders.

■■■ Spitters' second objection is the affirmative defense that the interest payments were made in the ordinary course of business. 11 U.S.C. § 547(c)(2) states that "[t]he trustee may not avoid under this section a transfer ... to the extent that such transfer was—(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, (B) made in the ordinary course of business or financial affairs of the debtor and the transferee, and (C) made according to ordinary business terms." Spitters has the burden of proving each of these three elements by a preponderance of the evidence. 11 U.S.C. § 547(g); *Food Catering*, 971 F.2d at 398.

Most disputes over the ordinary course of business defense revolve around elements (B) and (C). Element (A) "is not often litigated and is usually easily satisfied in the case of transactions with unrelated parties for general business purposes." *White v. Bradford, et al. (In re Tax Reduction Institute)*, 148 B.R. 63, 72 (Bankr.D.D.C.1992). However, the PDRA/HBK/Spitters loan agreement was far from a normal, "ordinary course of business" event. As this Court has found, it was a constructively fraudulent transfer. Logic and the plain meaning of the statute argue against the affirmation of the ordinary course of business defense in this case.

The Ninth Circuit has repeatedly ruled that the ordinary course defense cannot be used to shield payments made as part of a "ponzi" scheme. *See Henderson v. Buchanan*, 985 F.2d 1021, 1025 (9th Cir.1993); *Danning v. Bozek (In re Bullion Reserve of North America)*, 836 F.2d 1214, 1219 (9th Cir.), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988); *Graulty v. Brooks (In the Matter of Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.)*, 819 F.2d 214, 216–17 (9th Cir.1987). While the argument of these cases that the ordinary course defense should be reserved for recurring trade creditors such as utilities has been obviated by *Union Bank v. Wolas (In re ZZZZ Best Co., Inc.)*, 502 U.S. 151, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991), they still stand for the proposition that the debtor's original business transactions (that sparked the repayments) must not be improper.

From the facts presented at trial, it appears that HBK behaved somewhat like a ponzi operator, albeit with considerable assets. It desperately transferred cash between its separate corporate entities such as PDRA, concealed record of the Spitters loan from PDRA's creditors, and, until the time of the transfer of the Office Building to PDRA in mid–1990, treated the Spitters note as an obligation of HBK alone. This last factor makes the $1 million look more like a capital infusion from HBK, a situation which would bar use of the ordinary course defense. *See Pioneer Technology, Inc. v. Eastwood (In re Pioneer Technology, Inc.)*, 107 B.R. 698, 701–2 (9th Cir. BAP 1988).

Even aside from all of the cash-transfers and accounting records, in the end the Spitters note was a fraudulent transfer. This Court holds, as a matter of law, that when a transaction has previously been held to be fraudulent in violation of either 11 U.S.C. § 544(b) or § 548, the 11 U.S.C. § 547(c)(2) ordinary course of business defense cannot be used to shield payments made as part of that fraudulent transaction. Spitters must return the remaining $23,353.47 of the transferred interest payments to PDRA, and his non-subordinated unsecured claim, upon which he will be paid *in pari passu*, will be increased by that amount.

## IV. JUDGMENT

Judgment on all causes of action is rendered in favor of PDRA. Spitters shall return $43,095.89 to PDRA, increasing his total claim in the estate to $1,043,095.89. Of this amount, $477,846.87 will be equitably subordinated to all other unsecured debts of PDRA. Counsel for the Trustee shall prepare, submit and serve a form of judgment consistent with this opinion. Counsel for Spitters shall review as to form.